# Fly Fish Vermont, Inc., d/b/a The Fly Rod Shop, and Robert Shannon, Jr. v. Chapin Hill Estates, Inc. and Peter J. Fitzpatrick

[996 A.2d 1167]

No. 07-476

Present: Reiber, C.J., Dooley, Johnson and Burgess, JJ., and Davenport, Supr. J., Specially Assigned

Opinion Filed April 23, 2010

542

*Peter G. Anderson*, Stowe, for Plaintiffs-Appellees.

*Charles F. Storrow* of *Kimbell Storrow Buckley Hughes, LLP*, Montpelier, for Defendants-Appellants.

¶ 1. **Burgess, J.** In this action involving a boundary dispute and claims of nuisance and trespass related to the siltation of a pond, the appealing landowner contends that the trial court erred in establishing the boundary between the parties' properties and awarding compensatory damages for encroachment based upon that incorrectly established boundary. The landowner also argues that even if the court correctly established the boundary, it erred by awarding punitive damages without finding the requisite wrongful intent, or, alternatively, by awarding an excessive amount

of damages. We affirm the trial court's boundary determination, but reverse its award of punitive damages.

¶ 2. This case involves adjoining parcels of land, one situated downhill from the other, along Route 100 in Stowe. The downhill property is owned by plaintiff/appellee Fly Fish Vermont, Inc., which in turn is owned by plaintiff/appellee Robert Shannon, Jr. The uphill property is owned by defendant/appellant Chapin Hill Estates, Inc., which in turn is owned by defendant/appellant Peter J. Fitzpatrick. Plaintiffs sued defendants for damages, claiming that construction work associated with a development project on defendants' property caused siltation to enter and damage the pond on their property. Defendants counterclaimed, alleging, among other things, that the pond was located, at least in part, on their property. The trial court found in favor of plaintiffs and awarded them both compensatory and punitive damages.

¶ 3. The critical facts are not in dispute. In a 1963 deed, India Chapin conveyed to Harrington's of Vermont, Inc. (one of plaintiffs' predecessors-in-title), a 2.5-acre parcel of land and an easement to water from a spring on her retained property, which was later conveyed to Fitzpatrick. The deed described part of the boundary line between the conveyed and retained property as following along a brook that eventually flowed into a drainage pipe under Route 100. The deed also referenced a more accurate description of the conveyed parcel: a survey by James Rich recorded in the town land records. In part, the Rich survey described the boundary as running nine feet from an iron pin to a brook and then westerly along the center of the brook to the edge of Route 100, where the brook entered a large culvert.

¶ 4. The following year, in a 1964 deed, Chapin conveyed her remaining ninety-five acres of property to Fitzpatrick. Fitzpatrick surveyed part of the property in 1965 in contemplation of building a motel. In 1966, Fitzpatrick built a road, dubbed "Megan's Way," to the proposed motel construction site. Construction of the road effectively eliminated the surface brook that the applicable deeds had designated as a boundary line between the adjoining properties. All that remained of the brook was some intermittent ditching along the north side of a berm left over from construction of the road. Fitzpatrick eventually abandoned construction of the motel, but in 1969 sold part of his land to Chapin Hill Estates, Inc., one of his real estate development corporations.

¶ 5. In 1989, Harrington's conveyed its parcel to William Alley and his wife, another of plaintiffs' predecessors-in-title. That same year, Alley constructed a pond — the one involved in the instant dispute — to support his business of selling fly-fishing equipment and supplies. Aware of the construction, Fitzpatrick warned Alley to make sure that the pond did not extend past the boundary line. With the brook long gone, Alley understood the property boundary to be the intermittent ditching located alongside Megan's Way, so he made sure that he did not cross that line. Fitzpatrick knew where Alley built the pond but did not assert that it encroached upon the Chapin Hill property until years later during the events leading to this lawsuit.

¶ 6. In 1993, Alley and his wife conveyed their land to a couple, who divorced five years later. The wife was awarded the property and sold it to plaintiff, Robert Shannon and his fly-fishing supply business in March 2002. In the spring of 2004, plaintiffs received notice that Fitzpatrick and one of his development corporations had filed an application for approval of a subdivision proposal. About the same time, Fitzpatrick sent plaintiffs a letter asserting for the first time that the pond encroached upon his corporation's property. Fitzpatrick offered to adjust the boundary to allow for the pond encroachment in exchange for Shannon conceding any water rights he had to the spring on Fitzpatrick's property. Shannon rejected the offer.

¶ 7. In February 2005, Fitzpatrick obtained from the Town of Stowe a subdivision permit for his development project. The permit contained numerous conditions designed to minimize runoff resulting from the development. Construction on the development began in the summer of 2005 and continued into the fall of that year. Significant rainstorms, which occurred on four days between mid-October and mid-November, overwhelmed the incomplete measures that defendants had taken to prevent erosion and water runoff onto plaintiffs' property. As a result, a substantial amount of siltation entered plaintiffs' pond from defendants' property, causing damage to the pond.

¶ 8. During the fall of 2005, defendants failed to assure the adequacy of the erosion-control measures following the first two significant rainfalls in October. By late October, the Town considered defendants' apparent noncompliance with the permit conditions to be serious enough to hire its own independent engineer to inspect the site. The Town issued defendants a notice of violation

and a "stop work" order in December 2005, but did not commence any formal enforcement proceedings. Issues surrounding the deficiencies in defendants' erosion-control measures were not resolved to the Town's satisfaction until May 2006, after which the Town issued certificates of occupancy to defendants.

¶ 9. As the result of defendants' deficient and inadequately monitored erosion-control measures, significant silt-laden runoff entered plaintiffs' pond from denuded and destabilized construction areas on defendants' property, altering the pond's soil composition and filling the pond bottom with new material. This runoff resulted in significantly higher levels of turbidity in the pond water, which, in turn, reduced levels of natural biota in the water.

¶ 10. Plaintiffs filed suit against defendants in May 2006, asserting counts sounding in trespass and nuisance and claiming a prescriptive easement to the extent that defendants were asserting that the subject pond was located on defendants' property. Defendants filed a counterclaim, alleging that plaintiffs had abandoned any water rights on defendants' property and that plaintiffs' pond encroached upon defendants' property. In an October 2007 decision, the trial court determined that plaintiffs had abandoned any water rights on defendants' property; however, the court established a boundary line that located plaintiffs' pond entirely on plaintiffs' property and awarded plaintiffs $32,533 in compensatory damages and $100,000 in punitive damages, plus costs, as the result of defendants' activities damaging the pond.

¶ 11. In arriving at its boundary decision, the court determined that it was impossible to establish the location of the brook described in the early deeds and thus concluded that the most equitable and rational method for establishing the boundary between the parties' properties was to draw a straight line, or "tie line," between the two known and still-existing monuments. As for damages, the court compensated plaintiffs for the damage to their pond, but rejected as too speculative any award of damages for lost-business income. The court also awarded plaintiffs punitive damages because of defendants' reckless, if not intentional, disregard for plaintiffs' property rights. On appeal, defendants argue that the trial court erred in establishing the boundary between the parties and awarding plaintiffs punitive damages.

¶ 12. We begin with the court's boundary determination. Defendants contend that plaintiffs are not entitled to any award of damages resulting from sedimentation of the pond because the

court should have determined the boundary line along the brook as it existed at the time of the original conveyance of the subject properties, which would have placed at least part of the pond on defendants' property. According to defendants, the court erroneously assumed that because the brook had been destroyed by defendants' actions in 1966 and thus no longer existed, the boundary line could not be established as it existed in 1963 or shortly thereafter. Defendants assert that the location of the brook in 1963, as set forth in the Rich survey, is identifiable and undisputed and therefore should be established as the boundary line now. In support of this argument, defendants rely on the general rule that boundaries move with the gradual movements of streams over time, but not when streams move suddenly as the result of natural or man-made events.

¶ 13. We do not find defendants' arguments persuasive. Defendants correctly state the general rule that sudden as opposed to gradual changes in the course of a boundary stream do not alter the boundary. See 9 R. Powell, Powell on Real Property § 66.01[2], at 66-5 to 66-7 (M. Wolf ed. 2008) (noting general rule that boundary line between abutting landowners moves with waterway when change in location of body of water occurs by gradual process of accretion, but that boundary line does not change when location of body of water changes abruptly due to sudden process of avulsion). But see *Strom v. Sheldon*, 527 P.2d 1382, 1384-85 (Wash. Ct. App. 1974) (noting that accretion-avulsion rules "should not be mechanically applied"). In this case, however, there is no way to determine precisely where the brook was located in 1966 when defendants effectively obliterated it in the area where the pond was later built, nor is it possible to determine where the brook would have been located in 1989 when Alley constructed the pond.

¶ 14. There is a 2005 survey of the property, relied upon by both parties, that reveals several paths the brook took at various times in the past. Defendants insist that the trial court was obligated to rely upon the path indicated in the 1963 Rich survey referred to in the original deed, but they fail to provide a logical basis for doing so. It is undisputed that a survey done only two years later, in 1965, showed a different path of the brook meandering through the property. Although the brook's 1963 position and its different course in 1965 could be located from the respective depictions in those two surveys, the brook was not fixed

and there remains no trace of it, such as an old stream bed, to determine precisely where it ran in 1966 at the time it was obliterated by defendants' road construction. Notwithstanding the trial court's imprecise — and unremarkable — acknowledgement that the brook would not have "significantly" changed course between 1963 and 1966, the fact remains that there was no way for the court to tell where the brook actually was in 1966 when its surface course was erased. Nor could it fix the location of the boundary in 1989 when Alley constructed the pond. Thus, defendants were essentially asking the court to invent a boundary line to their benefit rather than accept the invented tie-line between the two known monuments that benefitted plaintiffs.

¶ 15. For several reasons, we decline to disturb the trial court's decision to do the latter. First, as noted, although the brook was a natural monument entitled to precedence over artificial monuments or metes-and-bounds descriptions, see *Marshall v. Bruce*, 149 Vt. 351, 353, 543 A.2d 263, 264 (1988), its course as of 1966 or 1989 could not be determined because it had been destroyed long before the hearing. Second, the fact that the course of the brook could not be determined was due to the activities of defendants, the same parties seeking to benefit from the uncertainty over the boundary. Although defendants are claiming here that they were disadvantaged by their actions, in fact their earlier actions prevented the court from establishing the subject boundary line as it may have existed in 1966 or 1989. Under these circumstances, the court acted well within its discretion in drawing a tie-line between the known monuments rather than choosing a boundary line based on a prior survey and speculation as to the later meandering of the brook. See *Pion v. Bean*, 2003 VT 79, ¶¶ 15-16, 176 Vt. 1, 833 A.2d 1248.

¶ 16. In support of their arguments, both sides cite *Pion v. Bean*, which is also the principal case relied upon by the trial court in establishing the disputed boundary line. In *Pion*, we upheld the trial court's decision to establish a disputed boundary by drawing a straight line between pins depicted in two competing surveys. 2003 VT 79, ¶¶ 12, 18. Defendants attempt to distinguish *Pion* by arguing that the trial court in that case did not ignore an original known monument. For the reasons stated above, this argument is unavailing — although the location of the brook was described in the deeds, it changed over time and thus was unknown at the time defendants eliminated the brook in 1966. The

trial court in this instance did not ignore a known monument; the location of the boundary brook at the critical time was not known. As we stated in *Pion*, the trial court's "determination of a boundary line is a question of fact to be determined on the evidence," and we will uphold such judgment unless clearly erroneous "despite inconsistencies or substantial evidence to the contrary." *Id.* ¶ 15. In this case, reviewing the evidence most favorably to the prevailing party and making all reasonable inferences in support of the trial court's judgment, we find no error in the court's establishment of the disputed boundary line. Because the trial court committed no error in establishing the boundary line, defendants' arguments that no compensatory damages can be awarded based upon damage to the plaintiffs' pond must also fail.

¶ 17. This leaves us with punitive (or exemplary) damages as the remaining subject of review. Defendants contend that the trial court's imposition of punitive damages is not warranted by the facts in light of the relevant law, and that in any event the award was excessive. Despite defendants' generally reckless violation of the permit conditions imposed for the protection of plaintiffs' pond, we agree the record cannot support a punitive award given the absence of outrageously reprehensible conduct and the lack of actual or legal malice towards plaintiffs.

¶ 18. Although the law governing punitive or exemplary damages in Vermont has not been a model of clarity,[1] recent decisions have solidified several basic principles. Punitive damages require a showing of essentially two elements. The first is wrongful conduct that is outrageously reprehensible. See *Follo v. Florindo*, 2009 VT 11, ¶ 44, 185 Vt. 390, 970 A.2d 1230 (reiterating that our precedent on the issue of punitive damages "limits the availability of punitive damages to cases where the evidence shows that defendant's wrongdoing . . . has the character of outrage frequently associated with crime" (quotations omitted)); *Cooper v. Cooper*, 173 Vt. 1, 14, 783 A.2d 430, 441 (2001) (observing that

---

[1] For example, we have disallowed punitive damages based on "reckless" or "heedless disregard of the consequences" in *Brueckner v. Norwich University*, 169 Vt. 118, 131-32, 730 A.2d 1086, 1097 (1999) (quotation omitted), while opining in *Pion* that sufficient malice can be proved "even by conduct showing a reckless or wanton disregard of one's rights," 2003 VT 79, ¶ 41 (quotation omitted). The instant decision will address the degree and quality of reckless disregard necessary to satisfy the threshold of misconduct and malice for punitive damages.

purpose of punitive damages is to respond to "truly reprehensible conduct" (quotation omitted)). The second is malice, defined variously as bad motive, ill will, personal spite or hatred, reckless disregard, and the like. See, e.g., *Monahan v. GMAC Mortgage Corp.*, 2005 VT 110, ¶¶ 55-56, 179 Vt. 167, 893 A.2d 298 ("Because the purpose of punitive damages is to punish conduct that is 'morally culpable' and 'truly reprehensible,' this Court has set a high bar for plaintiffs seeking such damages[,]" and "[o]ur cases make clear . . . that intentional, wrongful, and even illegal conduct will not justify punitive damages unless the evidence supports an inference of 'bad motive' evincing a sufficient 'degree of malice.' " (citations omitted)); *Brueckner*, 169 Vt. at 129, 730 A.2d at 1094 ("It is not enough to show that defendant's acts are wrongful or unlawful — there must be proof of defendant's bad spirit and wrong intention." (quotation omitted)); see also *Pion*, 2003 VT 79, ¶ 41 (reiterating that "[p]unitive damages are appropriate where there [is] a showing of actual malice").

■ ¶ 19. As noted above, in *Brueckner* we considered and expressly rejected an award of punitive damages based on the defendant's mere reckless disregard of the plaintiff's rights. 169 Vt. at 131-32, 730 A.2d at 1096-97. *Brueckner* involved a military-style university sued by a former student who complained that he was hazed as a freshman by upperclass members. The plaintiff claimed that the university negligently failed to supervise those upperclass members and was therefore vicariously liable for their misconduct. This Court upheld the finding of liability and award of compensatory damages, but, over a vigorous dissent, overturned an award of punitive damages, writing at some length to explain the grounds for such damages. We noted the purpose of punitive damages is to punish conduct that is morally culpable to the degree of outrage frequently associated with crime. *Id.* at 129, 730 A.2d at 1095. We added that such conduct need not only be wrongful, but truly reprehensible and that the defendant must have acted with malice, emphasizing that there must be "some showing of bad motive." *Id.* at 129-30, 730 A.2d at 1095 (quotation omitted).[2]

---

[2] The same threshold of wrongful-conduct-plus-malice limits exemplary damages in breach of contract cases, as well. See *Villeneuve v. Beane*, 2007 VT 75, ¶ 10, 182 Vt. 575, 933 A.2d 1139 (mem.) (recognizing exception to bar against punitive damages for breach of contract in case of "wilful and wanton or fraudulent tort,

▮ ¶ 20. In addition, we reiterated in *Brueckner* that actionable misconduct alone, " 'however wrongful,' " cannot sustain punitive damages without the additional element of malice. *Id.* at 130, 730 A.2d at 1095 (quoting *Meadowbrook Condo. Ass'n v. S. Burlington Realty Corp.*, 152 Vt. 16, 28, 565 A.2d 238, 245 (1989) (even wilful violation of consumer protection statute could not, in and of itself, support punitive award because "defendant's conduct . . . , however wrongful, did not evince the degree of malice required")). Following on this point, we similarly rejected exemplary damages in *Bolsta v. Johnson*, 2004 VT 19, 176 Vt. 602, 848 A.2d 306 (mem.), when we affirmed the trial court's denial of punitive damages based on defendant's wilful DUI violation, holding that such violation alone proved no "more than a reckless disregard of the right of others," and so failed to meet the standard for malice articulated in *Brueckner*. *Bolsta*, 2004 VT 19, ¶ 7. *Brueckner* thus confirmed what a federal judge had noted earlier, that in considering punitive damages, "Vermont courts have used 'reckless' language, but seem to require bad motive on top of the intentional tort." 169 Vt. at 130 n.2, 730 A.2d at 1095 n.2 (citing with approval *Kolstad v. Am. Dental Ass'n*, 108 F.3d 1431, 1443 (D.C. Cir. 1997) (Williams, J., dissenting) (quotations omitted)). That a separate element of malice not only seems, but *is*, necessary to prevail on a punitive claim was further confirmed by *Bolsta*, 2004 VT 19, ¶ 7.

¶ 21. Our task in the present case is to draw a line at which reckless, wanton, or heedless misconduct can be fairly said to equal the reprehensibility of a particularly egregious wrongful action combined with actual malice. The driving concern in *Brueckner* was, and is still, that a threshold of reckless disregard — without more — would be "so flexible that it can become

---

or when the evidence indicates the breaching party acted with actual malice"); *Monahan*, 2005 VT 110, ¶ 60 (vacating jury award of punitive damages in a breach of contract dispute, in part, because "[n]egligent indifference . . . does not rise to the level of malice" necessary for punitive damages award); *Murphy v. Stowe Club Highlands*, 171 Vt. 144, 155, 761 A.2d 688, 696 (2000) (striking punitive award where, even if developer's breach of contract deemed malicious, "malice alone is not sufficient to support an award of punitive damages in a breach of contract case" when contractor's failure to perform not "akin to a willful and wanton, or fraudulent, tort"); *Ainsworth v. Franklin County Cheese Corp.*, 156 Vt. 325, 331-32, 592 A.2d 871, 874-75 (1991) (explaining that punitive damages may be awarded when breach of contract has "character," if not all of the elements, of a "willful and wanton or fraudulent tort" that must include or be accompanied by malice (quotation and emphasis omitted)).

virtually unlimited in its application." 169 Vt. at 131 n.3, 730 A.2d at 1096 n.3 (quotation omitted). Allowing punitive damages solely upon "heedless disregard of the consequences" was similarly unacceptable. *Id.* at 132, 730 A.2d at 1097 (quotation omitted).

¶ 22. Since *Brueckner*, we have upheld punitive damage awards on proof of patently outrageous misconduct that also included either an element of bad motive by definition, or were otherwise accompanied by demonstrable malice. See *DeYoung v. Ruggiero*, 2009 VT 9, ¶¶ 29-30, 185 Vt. 267, 971 A.2d 627 (inferring malice as matter of law when fiduciary lawyer stole widowed client's funds and lied about it to avoid discovery); *Follo*, 2009 VT 11, ¶¶ 45-46 (remanding for jury determination of punitive damages upon verdict against defendant for common law fraud because "actual fraud is accomplished with an evil intent, and if a jury finds that actual fraud was committed, an injured party is entitled to have the jury consider punitive or exemplary damages" and noting further that "actual common law fraud, as opposed to other kinds of intentional torts, inherently possesses the necessary malice and ill will that may make punitive damages appropriate" (internal quotes omitted)); *Shahi v. Madden*, 2008 VT 25, ¶ 26, 183 Vt. 320, 949 A.2d 1022 (holding punitive damages not excessive where "defendant waged a campaign of terror against plaintiffs motivated in part by sectarian and racial bias"); *Bolsta*, 2004 VT 19, ¶ 7 (holding that reckless DUI alone, absent additional evidence of personal animus or other bad motive, was insufficient to establish malice necessary for punitive award); *Pion*, 2003 VT 79, ¶ 42 (noting "overwhelming" evidence of actual malice to justify punitive award for deliberate destruction of property, removal of property marker pins, and calculated trespass — all coincident to serial verbal harassment); *Wharton v. Tri-State Drilling & Boring*, 2003 VT 19, ¶ 19, 175 Vt. 494, 824 A.2d 531 (mem.) (finding exemplary damages well supported by record where drilling company deliberately filed, then persisted with, false mechanic's lien on property in effort to extort right-of-way concessions from owners who had no prior business with company and owed nothing); *City of Burlington v. Arthur J. Gallagher & Co.*, 173 Vt. 484, 488, 788 A.2d 18, 22 (2001) (mem.) (affirming trial court's dismissal of punitive damages claim in indemnity suit against insurance broker, because "[s]imply engaging in wrongful conduct is insufficient to establish the element of malice necessary to successfully recover punitive damages"); *Cooper*, 173 Vt. at 14-15,

783 A.2d at 441 (affirming punitive award in a breach of fiduciary duty action arising from wrongful foreclosure by former father-in-law in scheme to oust his son's ex-wife from cotenancy in retaliation for her gaining custody of children, perceived mistreatment of his son, and alienation of grandchildren).

¶ 23. The notion of malice arising from acting with a wanton disregard for great harm is long-settled by Vermont law. In the context of criminal law, malice was defined for first degree murder as the requisite intent to kill. See *State v. Tatro*, 50 Vt. 483, 492 (1878); see also *State v. Battick*, 133 Vt. 558, 561, 349 A.2d 221, 223 (1975). Malice for second degree murder, on the other hand, could be satisfied by evidence of " 'an intention to do great bodily harm, or a wanton disregard of the likelihood that one's behavior may naturally cause death or great bodily harm.' " *State v. Sexton*, 2006 VT 55, ¶ 12, 180 Vt. 34, 904 A.2d 1092 (quoting *State v. Doucette*, 143 Vt. 573, 583, 470 A.2d 676, 682 (1983)); accord *Tatro*, 50 Vt. at 492-93. In civil jurisprudence, malice was similarly synonymous with conduct borne out of wickedness, wilfulness, or cruelty, either resulting in measurably increased or aggravated injury to the plaintiff, or manifesting behavior that warrants punishment. See *Devine v. Rand*, 38 Vt. 621, 626-27 (1866). Moreover, malicious conduct was distinguishable from conduct based on mistaken judgment, or even actions taken in the heat of natural anger. *Id.* at 626.

¶ 24. This approach is consistent with the view expressed by American Law Institute in distinguishing recklessness — where a defendant knows there is a high risk of physical harm to another, but "deliberately proceeds to act, or fails to act, in conscious disregard of . . . that risk" — from simple negligence, characterized as "mere inadvertence, incompetence, unskillfulness, or a failure to take precautions." Restatement (Second) of Torts § 500 cmts. a & g (1965). The latter, lacking malice, cannot support punitive damages, while the conscious disregard of a known and sufficiently serious risk of harm is the equal of malice. The Iowa Supreme Court has regularly emphasized the awareness of risk necessary to justify an award of punitive damages: only in those instances where an "actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." *Cawthorn v. Catholic Health*

*Initiatives Iowa Corp.*, 743 N.W.2d 525, 529 (Iowa 2007) (quotation omitted); *Walker v. Mlakar*, 489 N.W.2d 401, 409 (Iowa 1992). This is also consistent with the reservations expressed in, and the ultimate ruling of, *Brueckner*.

¶ 25. Accordingly, we hold that the culpability necessary for an award of punitive damages based on reckless or wanton misconduct requires evidence that the defendant acted, or failed to act, in conscious and deliberate disregard of a known, substantial and intolerable risk of harm to the plaintiff, with the knowledge that the acts or omissions were substantially certain to result in the threatened harm. In keeping with our consistent preconditioning of punitive damage upon outrageously egregious misconduct, the reckless malfeasance or nonfeasance and its attendant risk of harm must all be more reprehensible than simply wrongful or illegal behavior.[3] We incorporate recklessness as a component of

---

[3] Misconduct motivated by fraud, associated with traditional notions of crimen falsi or moral turpitude or deliberately oppressive trespass are often sustained as grounds for punitive damages. See *King v. Brace*, 150 Vt. 222, 224-25, 552 A.2d 398, 399 (1988) (upholding punitive award where record showed defendant's actions met threshold of wilful and wanton conduct "manifesting personal ill will, or . . . a reckless or wanton disregard of [one's] rights"); *Hilder v. St. Peter*, 144 Vt. 150, 165, 478 A.2d 202, 211 (1984) (noting punitive damages available where defendant landlord's flagrant and repetitive disregard of tenant's rights "evince[d] a pattern of intentional conduct . . . for which the term 'slumlord' surely was coined"); *Nye v. Merriam*, 35 Vt. 438, 446 (1862) (exemplary damages allowable for willful fraud); cf. *Shortle v. Cent. Vt. Pub. Serv. Corp.*, 137 Vt. 32, 33-34, 399 A.2d 517, 518-19 (1979) (affirming trial court's refusal to instruct jury on punitive damages where record did not show malice manifesting ill will, insult or oppression, or reckless and wanton disregard of one's rights); see also *Prozeralik v. Capital Cities Commc'ns, Inc.*, 626 N.E.2d 34, 42 (N.Y. 1993) (requiring spite or fraudulent or evil motive for award of punitive damages); *Liberman v. Riverside Mem'l Chapel, Inc.*, 650 N.Y.S.2d 194, 200 (App. Div. 1996) (jury instructions on punitive damages appropriate where defendant consciously and deliberately disregarded civil and religious laws in its actions). On the other hand, strict liability offenses, such as regulatory violations without malice or consumer fraud without actual intent to deceive, have not been deemed sufficient to warrant an exemplary award. *Cooper*, 173 Vt. at 14, 783 A.2d at 441 (punitive damages claim unsustainable on evidence that defendant's acts wrongful or unlawful without additional proof of defendant's bad spirit and wrong intention); *State Agency of Natural Res. v. Riendeau*, 157 Vt. 615, 625, 603 A.2d 360, 365 (1991) (concluding punitive damages could not be sustained on fact that statutory penalties were available or without explicit finding that defendants' indifference to legal obligations and the environmental consequences amounted to malice); *Meadowbrook Condo. Ass'n*, 152 Vt. at 28, 565 A.2d at 245 (disregard of civil obligation, motivated by "an unwillingness to make the

malice, but establish a measure by which heedless or wanton misconduct reaches the point of actual malice. Thus, punitive damages are not limited to intentional egregious torts only, but can extend to egregious harm resulting from reckless conduct amounting to malice.

¶ 26. Considering the findings and grounds asserted by the trial court for its award of punitive damages, the wrongful conduct in this case falls short of the kind of outrageously egregious actions justifying punitive damages under our case law and is legally indistinguishable from *Brueckner*. Certainly impressed with defendants' recalcitrance, the trial court found the record

> clear, convincing, and compelling that Defendants did recklessly, if not intentionally fail to take reasonably available steps, which they were required to take by law and by directly applicable permit conditions, to prevent the consequences of erosion and sediment runoff from unreasonably, and adversely impacting Plaintiffs' property. Defendants repeatedly exhibited a lack of care, and concern for the obvious impact the sediment runoff was having on Plaintiffs' property . . . . [Their] efforts to address the problems were sporadic, minimal, and grudging at best.
>
> . . . .
>
> Defendants were not truly motivated to completely, and adequately address the erosion runoff from their property until . . . their own economic self-interest — and not any real concern for Plaintiffs' rights as adjacent landowners — made it imperative to meet the Town's continuing site remediation demands in order to obtain the [certificates of occupancy] for the two houses already built, and ready for sale.

¶ 27. The court also noted, however, that defendants "did not deliberately create the means by which silt would be directed towards the pond." Ultimately, then, defendants were deemed reckless scofflaws who ignored permit conditions and were indif-

---

necessary expenditures," though wilful violation of consumer fraud statute, not enough to support punitive award); *Bruntaeger v. Zeller*, 147 Vt. 247, 253, 515 A.2d 123, 127 (1986) (holding award of exemplary damages under Vermont Consumer Fraud Law only allowable on showing of malice, ill will, or wanton conduct).

ferent to plaintiffs' interest. According to the trial court, defendants did not act with actual malice. Regardless of defendants' reckless disregard for the consequences of their actions or inactions, the threatened and resulting harm were not — compared to our precedent — so outrageously reprehensible as to render defendants' recklessness malicious as a matter of law.

■ ¶ 28. That defendants were in wilful violation of their permit or indifferent to plaintiffs' rights, or both, is not determinative of malice. As in *Meadowbrook*, a "wilful violation" of the law does not "evince the degree of malice required." 152 Vt. at 28, 565 A.2d at 245. Nor is a "wilful and knowing" violation of environmental laws necessarily reflective of the bad motive required to justify punitive damages. *Riendeau*, 157 Vt. at 624-25, 603 A.2d at 365. In *Riendeau*, addressing circumstances not altogether dissimilar from this case, we determined that the knowing and wilful discharge of mud and silt into a brook by loggers in violation of water quality laws would not support punitive damages absent a malicious motive, in addition to the wrongful acts. *Id.* In contrast, evidence of one neighbor's "campaign of terror" against another, accompanied by deliberate trespass and intentional destruction of property, could support a jury award of punitive damages. *Shahi*, 2008 VT 25, ¶ 25. It was settled in *Brueckner* that a defendant's knowing and even gross indifference to a plaintiff's rights was likewise insufficient to satisfy the malice threshold for exemplary damages. 169 Vt. at 131-32, 730 A.2d at 1096-97. Here, the superior court's characterization of defendants' indifference as "reckless" invokes no more culpability for punitive damages than the "knowing and wilful" misconduct already determined legally insufficient under our case law.

¶ 29. Though also a case involving a wilful violation of law in reckless disregard of a plaintiff's rights, the result in the recently decided *DeYoung v. Ruggiero* should not be confused with the situation here. In *DeYoung*, which dealt with a claim for punitive damages in an embezzlement case and issued after the trial court's decision in this case, we considered the meaning of malice and bad motive, explaining that "malice may arise from deliberate and outrageous conduct aimed at securing financial gain or some other advantage at another's expense, even if the motivation underlying the outrageous conduct is to benefit oneself rather than harm another." 2009 VT 9, ¶ 27. The defendant in *DeYoung* intentionally misappropriated money from a widowed plaintiff and

lied about it, conduct sufficient to establish malice through bad motive. No reckless disregard analysis was necessary to find malice in *DeYoung*. Defendant's half-measures in the present case, while noncompliant with the permit conditions and heedless of the consequences to the pond, were far less egregious than the deliberate defalcation in *DeYoung*, and no more culpable than the violations found below the threshold for punitive damages in *Riendeau*.

■ ¶ 30. The superior court here further explained that it intended the exemplary award to send a strong message to permit offenders motivated by self-interest and profit at the expense of others. Vindication of the permit process is not, however, an independent basis for punitive damages. The subdivision permit was a public, rather than private, permit to proceed on conditions. Public interest in permit compliance can be met through permit enforcement actions, or, in the case of violating water quality standards, criminal prosecution. See, e.g., 10 V.S.A. §§ 1274 & 1275 (authorizing enforcement for violations of discharge permits and setting penalties for permit violations, including imprisonment of up to six months per violation); 24 V.S.A. § 4451 (providing penalties for land-use permit violations). In any event, public interest in deterrence is no substitute for the predicates of malice and outrageously reprehensible conduct necessary to a private action for exemplary damages, but which are missing here.

*Affirmed as to the boundary judgment. Reversed as to the judgment on punitive damages.*