McCord v. Asante, No. 17-1-10 Rdcv (Teachout, J., Jan. 17, 2012)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **Rutland Unit** | **Docket No. 17-1-10 Rdcv** |

**CARNELL MCCORD,**
     **Plaintiff**

v.

**KWASI ASANTE,**
     **Defendant**

## DECISION
### Findings of Fact and Conclusions of Law

This matter came before the court for final hearing in this landlord-tenant case on October 20, 2011. Plaintiff was present and represented by Attorney Julie Carp. Defendant was present and represented by Attorney Karl C. Anderson. On October 27, 2011, both attorneys filed proposed Findings of Fact, and Plaintiff's attorney filed proposed Conclusions of Law.

Plaintiff, who rented property from Defendant, seeks recovery based on alleged illegal eviction, violation of the landlord's warranty of habitability, intentional infliction of emotional distress, and the Consumer Fraud Act. Defendant has counterclaimed for unpaid rent. Based on the credible evidence, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

Defendant Kwasi Asante is the owner and landlord (hereinafter Landlord) of rental property at 99 Park Avenue in the City of Rutland, which he purchased in November of 2006. He has an engineering degree from Dartmouth College and works at Dubois & King. In the City of Rutland, each time a new tenant assumes occupancy of a rental unit, the owner is required to obtain a Certificate of Occupancy. The last time prior to Landlord's purchase that a Certificate of Occupancy was obtained for this property was in 2003. In June of 2007, seven months after Landlord's purchase, the City did an inspection, and wrote to Landlord on July 11, 2007 listing two pages of safety code violations and describing corrections that needed to be made, and providing 60 days for the corrections to be completed and the City notified. The City received no response. There is no evidence that all the required corrections were ever made, although Landlord claims he did some work on the property. He never contacted the City for the required followup inspection, and he never obtained a Certificate of Occupancy.

In May of 2008, Plaintiff Carnell McCord (hereinafter Tenant) became a subtenant of Apt. #3 by renting a portion of it--one room with shared use of kitchen and bath--from Greg at

$100 per week. Three months later, Greg moved out and Tenant's girlfriend, Sarah, moved in. Tenant continued to pay $100 per week.

At some point Landlord had Tenant sign the last page of a document. It is undisputed that Tenant signed the last page, but he states that he never saw the other pages, and never had a copy. Landlord offered into evidence a 5-page lease document with Tenant's signature, which provides for rent of $175 per week. Tenant never paid $175 per week. He continued to pay $100 per week. Sometimes he was given receipts for payments and sometimes he was not. Landlord never requested payment in any higher amount. The Court finds that there was an oral rental agreement for rent of $100 per week. Landlord's evidence does not meet his burden of proof to show that the written lease represented an agreement made between the parties, nor that the rent was $175 per week.

On November 13, 2009, the City inspected the first floor and basement units of the property and found electrical violations. It ordered Landlord to have an inspection done by a master electrician and report back by November 27, 2009, and enclosed a copy of the July 2007 letter with a direction to arrange for a followup inspection. Landlord did not report back.

At about the same time, in late November 2009, the heat in the Tenant's unit began to be intermittent. Rutland rental housing standards require that a rental unit have heat that maintains a temperature of at least 65 degrees. The heat was on sometimes, but failed at other times. Tenant called Landlord, who was out of town during the week, and came by on Friday evening when he returned. When Landlord was present, the heat was 70 degrees. Landlord did not do anything, and the problem continued. The heat came on sometimes, and provided heat sometimes, but also shut off periodically, not providing sufficient heat. Tenant called Landlord repeatedly or spoke to him face to face, but Landlord did not respond to Tenant's calls, and told him in personal conversations that he could not do anything or just laughed.

Tenant, who was current in the rent of $100 per week he had been paying for 1 ½ years, contacted Landlord approximately ten times. There was no response to the heat problem. On December 1, 2009, Tenant stopped paying rent. Tenant and Sarah had a baby who had been born in the spring, and the heat supply was not sufficiently reliable for maintaining a residence.

On December 9, 2009, the City Building Inspector James Simonds sent a letter to Landlord stating that the matter of electrical violations was being referred to the State Division of Fire Safety. Plaintiff began recording the maximum temperatures reached in the apartment, even when the heat was turned up high. They did not meet the required temperature level on a consistent basis. On December 11, 2009, Tenant's lawyer from Vermont Legal Aid wrote to Landlord asking that the heat be fixed.

The next day, December 12, 2009, Landlord gave a Notice to Quit to all tenants, telling them to be out by January 21, 2010. Landlord went upstairs to deliver the notice to Tenant, and said, "There's nothing wrong with the f----- heat," and that he (Landlord) "was going to get you the f--- out, and don't forget the lazy bitch." He did not fix the heat. Tenant believes that Landlord sent this notice once he (Landlord) learned that Tenant knew about the City's effort to enforce safety violations related to electricity.

On December 18, 2009, Tenant's lawyer sent another letter to Landlord demanding that the heat be fixed. Landlord did not fix the heat.

On December 30, 2009, James Simonds inspected the property concerning the heat problem. When he first arrived, the furnace was running and there was some heat (63 degrees). The temperature reached a maximum of 67 degrees, although the thermostat was set at 80 degrees, but then the furnace then kicked out, and did not come on again during the next 30 minutes that Mr. Simonds remained in the unit. It was a cold day.

Mr. Simonds wrote again to Landlord on January 6, 2010, advising that "upon receipt of this letter, you will need to take immediate steps to have a qualified person look at the thermostat and boiler to find and rectify the problem. A copy of this letter is being forwarded to Frank Cioffi at the Division of Fire Safety." Landlord telephoned in response that he was waiting for the tenants to vacate the premises. Otherwise, he took no steps to comply. The termination date was two weeks away, during one of the coldest months of the year.

By this time, Sarah and the baby were no longer living at the unit, due to the unreliable heat. They stayed either with her sister or her mother. In addition to the need to provide reliable heat for a baby, Sarah had an operation and was hospitalized for three days, and needed an appropriate residence for recovery. During December, Tenant himself stayed either with Sarah and the baby wherever they were, if there was room, or with his brother in Bennington. He continued to occupy the property as the family residence, but the family could not live there without reliable heat. He stopped by periodically and occasionally slept overnight if there was sufficient heat. During this period, Tenant incurred $200 in rent paid to Sarah's family, and $100 in extra food costs provided to Sarah's family, as he cooked for her family in partial payment of rent. He also incurred transportation expenses back and forth to Bennington, and paid $300 to his brother for rent.

On January 7, 2010, Tenant filed this case, and obtained a Temporary Restraining Order requiring Landlord to fix the heat. Landlord called Duffy Coal, which came and repaired the furnace on January 12, 2010 for a total cost of $96.50. On January 14th, Landlord asked Tenant if the heat was working. Tenant stated that it was, and paid Landlord $200 for the following two weeks. Tenant also paid $175 in rent in February, and then vacated the premises altogether on February 12, 2010.

**Conclusions of Law**

Warranty of Habitability

Under 9 V.S.A. Sec 4457 and related case law, a landlord warrants habitability of a rental property, specifically that the premises are safe, clean and fit for human habitation and comply with the requirements of applicable building, housing and health regulations. From the beginning of Tenant's tenancy, Tenant's unit was not in compliance with Rutland housing regulations, as Landlord never demonstrated compliance with the violations identified in the July 2007 letter prior to renting to Tenant in 2008, and never obtained a Certificate of Occupancy.

3

Landlord had notice of the problems from the July 2007 letter, and the problems were serious enough that they were referred to the Vermont Division of Fire Safety for enforcement.

In addition, beginning in late November, 2009, Landlord had actual notice that the heat provided in the apartment failed to meet the heat requirements for Rutland rental housing units. The lack of consistent heat at the required temperature materially affected health and safety, and Landlord failed to repair the heating problem within a reasonable period of time.

For these two reasons, the property was out of compliance with the warranty of habitability throughout Tenant's entire tenancy, from May of 2008 to mid-February, 2010. Therefore, Tenant has a right to damages, costs, and reasonable attorneys' fees. 9 V.S.A. Sec. 4457(a)(3). Damages consist of the $600 that Tenant had to pay for renting other premises during the period of his tenancy. Tenant is also entitled to costs and attorneys' fees. Plaintiff's counsel shall submit time and billing records so that the Court can determine a reasonable amount of attorneys' fees.

Illegal Eviction
The evidence shows that for the period between December 1, 2009, when Tenant had notified Landlord of the heat problem and began withholding rent, to December 11, 2009, when Tenant's lawyer first sent Landlord a letter requesting that the heat be fixed, Landlord may not have believed that there was really a problem, based on his own visit, or he was being slow in responding to a problem he did not want to face. In any event, the evidence does not support a finding that prior to December 12, 2009, Landlord's failure to fix the heat was willful.

That changed on December 12, 2010, when Landlord said to Tenant "There's nothing wrong with the f----- heat," and that he (Landlord) "was going to get you the f--- out, and don't forget the lazy bitch" and then did nothing to fix the heat even though the termination date was almost six weeks away and it was midwinter in Vermont. This conduct demonstrates a willful refusal to fix the heat problem and a willful intent to deprive the Tenant of proper heat so that he would leave. As such, it constitutes an illegal eviction: "No landlord may willfully cause, directly or indirectly, the interruption or termination of any utility service being supplied to the tenant, except for temporary interruptions for emergency repairs." 9 V.S.A. Sec. 4463.

Damages for illegal eviction include, in addition to the out-of-pocket damages, costs, and attorneys' fees already awarded above, compensatory damages for discomfort, annoyance, inconvenience, mental suffering, humiliation, and indignity. *Villaneuve v. Beane,* 2007 VT 75. In this case, the period of time that Landlord was attempting to drive the Tenant out by failing to provide consistent heat was a full month, from December 12, 2009 to January 12, 2010. The Court finds that the sum of $3,000, which is approximately $100 per day, is a reasonable sum for such damages. This takes into account that the discomfort, inconvenience, and humility is significant in the middle of winter, and uses as a very rough measure of damages an amount in the range of what it might have cost the Tenant to pay per day or week for a motel or other substitute accommodation.

Plaintiff seeks punitive damages as well, but in view of other damages awarded in this case, and the recent case law on punitive damages as set forth in the next section, the Court declines to award punitive damages for the illegal eviction in this case.

Consumer Fraud Act

Landlord rented premises to Tenant after having been given clear notice by the Rutland Building Inspector in July 2007 of two pages of safety code violations, and having been allowed 60 days correct the violations and contact the Building Inspector for a followup inspection. Landlord never did so, yet rented to Tenant nonetheless, knowing that he had failed to comply with Rutland rental housing requirements and knowing that he was providing Tenant with a non-complying rental unit in violation of 9 V.S.A. Sec. 2453(a). This is not a situation in which a property owner became a landlord by renting out an apartment over a garage, for example, and was unaware of the requirement to obtain a Certificate of Occupancy before the beginning of a rental. In this case Landlord purchased the building to engage in the business of renting residential property, and was specifically informed by the City of violations that needed correction, and specifically told to make corrections and arrange for a followup inspection in a specified period of time. Tenant is thus entitled to the remedies specified in 9 V.S.A. Sec 2461(b).

Under that section, Tenant is entitled to either damages or the consideration given by Tenant to Landlord. Compensatory damages have already been awarded for the period starting in December of 2009 on the legal grounds stated above. With respect to the period from May of 2008 through November of 2009, the evidence shows no specific damages. As to the alternate remedy of consideration paid, Tenant paid $100 per week, or $100 x 80  weeks = $8000.00. Considering, however, that Tenant did have the benefit of housing during that period without apparent defect, and considering that Landlord had done some work on the property to address some of the violations and there is no evidence identifying any specific hazardous condition or violation of City housing standards, it is reasonable for Landlord to have a credit of half that amount for value provided to Tenant. Thus, Tenant is awarded $4,000.00 on the Consumer Fraud Act claim.

The Consumer Fraud Act also allows for the potential recovery of exemplary damages up to three times the value of the payments made by Tenant. 9 V.S.A. Sec 2461(b). In order to be entitled to recover exemplary damages, Tenant is required to show "malice, ill will, or wanton conduct" on the part of landlord. *L'Esperance v. Benware*, 2003 VT 43, ¶ 17, 175 Vt. 292. The Vermont Supreme has recently clarified that malice requires more than an "indifference to plaintiffs' rights" and that even a "willful violation of the law" will not necessarily suffice. *Fly Fish Vermont, Inc. v. Chapin Hill Estates, Inc.*, 2010 VT 33, ¶ 28, 187 Vt. 541. Rather, the defendant's actions must be "outrageously reprehensible." *Id*. at ¶ 27.

Here, Tenant cannot satisfy this heavy burden with respect to renting to Tenant without having obtained the City inspection or obtaining a Certificate of Occupancy. Although the evidence shows that Landlord engaged in a "willful violation of the law" by renting the unit to Tenant, it does not support a finding of malice as a matter of law. Instead, Landlord's behavior in renting the apartment to Tenant despite his awareness of code violations is best characterized as "indifference" to the Tenant's rights. As the Vermont Supreme Court has stated, indifference

5

without some sort of more egregious behavior is not sufficient to support a finding of malice and therefore an award of exemplary damages. This case lacks the something more to allow for a finding of malice.   The Landlord's behavior in this case in renting to Tenant without getting a arranging for a followup inspection by the City or obtaining a Certificate of Occupancy is not as egregious as that which qualified for exemplary damages in *Villaneuve v. Beane,* 2007 VT 75.

Intentional infliction of emotional distress

Tenant also asserts a claim for intentional infliction of emotional distress due to Landlord's treatment of Tenant. In order to make out such a claim, Tenant must show "outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Sheltra v. Smith*, 136 Vt. 472, 476 (1978). Tenant has a heavy burden in making out this claim as the conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community." *Dulude v. Fletcher Allen Health Care, Inc.*, 174 Vt. 74, 79 (2002).

Although Landlord's conduct in renting the apartment in violation of the code may have been wrongful, the Court cannot conclude that it was "outrageous" under this standard. Nor can the Court conclude that it was designed to cause Tenant emotional distress or done with a reckless disregard of the probability of causing Tenant emotional distress. Therefore, Tenant cannot make out an intentional inflection of emotional distress claim in regards to the Landlord's failure to rectify code violations before renting the apartment.

Tenant has, however, made out an intentional infliction of emotional distress claim with regards to Landlord's behavior once notified by Tenant's attorney of the heating problem in the apartment.  One day after Tenant's attorney wrote the letter, Landlord gave Tenant a Notice to Quit and told him, "There's nothing wrong with the f----- heat," and that he (Landlord) "was going to get you the f--- out, and don't forget the lazy bitch." Landlord then failed to take any further steps on the heating problem throughout one of the coldest months of the year, informing the City Building Inspector that he was waiting for Tenant to vacate the apartment.

These actions support a claim for intentional infliction of emotional distress. They show that Landlord not only ignored the heating issue but that he did so purposefully in an attempt to unlawfully drive Tenant out of the apartment. A landlord's unlawful use of self-help to attempt to regain possession of an apartment can support an intentional infliction of emotional distress claim. *Birkenhead v. Coombs*, 143 Vt. 167, 174-75 (1983) (affirming award of damages for intentional infliction of emotional distress where landlord cut off electricity, heat, and water in an attempt to force tenant to leave the apartment). Here, Landlord's willful failure to remedy the heating problem during the height of winter was outrageous conduct intended to inflict emotional distress upon Tenant. Tenant has also shown that these actions did in fact produce emotional distress. Therefore, Tenant is entitled to a remedy on his intentional infliction of emotional distress claim.  The damages, however, duplicate the damages previously awarded for illegal eviction, and will not be awarded twice.  This analysis shows, however, that there are two separate and distinct legal grounds for the imposition of damages in the amount of $3,000.00.

6

Counterclaim for unpaid rent

Tenant was current in payment of rent until December 1, 2009. Because Landlord failed to repair the heat after receiving actual notice, and the lack of heat materially affected health and safety, Tenant was entitled to withhold rent for the period from December 1, 2009 to January 14, 2010 under 9 V.S.A. Sec. 4458(a)(1), which he did. He resumed rental payments when the heat problem was fixed. Landlord has not proved his counterclaim.

**Order**

Plaintiff's counsel shall submit time and billing records for attorneys' fees, as well as a bill of costs. Defendant's counsel shall have 15 days to file any objections.

Dated at Rutland, Vermont this 17th day of January, 2012.

_____
Hon. Mary Miles Teachout
Superior Judge