Birchwood Land Dev. Corp. v. Ormond Bushey & Sons, Inc., No. S0946-08 CnC (Tomasi, J., Oct. 7, 2011)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT

SUPERIOR COURT                                                    CIVIL DIVISION
Chittenden Unit                                                  No. S0946-08 CnC

---

Birchwood Land Development Corp.,
  Plaintiff,

 v.

Ormond Bushey & Sons, Inc.,
  Defendant.

---

### Findings Of Fact, Conclusions Of Law, And Order

This matter came for trial before the Court on February 7; February 9; April 4; and April 5, 2011. Both parties were represented by counsel and provided testimonial and documentary evidence to the Court. The Court also conducted a view of the development site at issue. Based on the foregoing, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT AND OVERVIEW OF CLAIMS

### I.    The Principal Dispute Between the Parties

This matter arises out of a construction project undertaken in Essex, Vermont. Birchwood Land Development Company ("Birchwood") entered into two contracts for the required work with Ormond Bushey & Sons, Inc. ("Bushey"). The first contract was designated the Rosewood Contract or the Rosewood Contract. The

second was designated the Tanglewood Contract or the Tanglewood Project.[1]  Both

projects were designed to create roadways and building lots that might be sold by

Birchwood.  As the area was essentially wild and overgrown, the projects involved

significant grading of the area, removal of trees and stumps, installation of sewers

and utilities, and the paving the newly created roadways, among other things.

The main dispute between the parties centers around excavated sand that

Bushey removed from both projects.  Bushey used or sold the sand and, through its

principal Dean Henry, claims it had a right to do so under the Contracts.

Birchwood, through its owner Owen Jenkins, insists that the sand was its property

and that Bushey removed it and expropriated it for its own gain in violation of the

Contracts.  Birchwood refused to make final payments to Bushey under the

Contracts based on the sand issue.  Both parties have sued for breach of contract

based on the above-described conduct.  As discussed below, there are other minor

issues that divide the parties as well.

## II.   Matters Resolved by Agreement or Prior Court Ruling

During trial, the parties resolved a number of disputes between them by

agreement and submitted a Stipulation to the Court on those points.  For example,

as noted, Birchwood refused to pay certain sums allegedly owing to Bushey under

the Tanglewood Contract.  It did so based on its belief that Bushey actually owed

Birchwood money with regard to its claims for sand taken from the site.  The parties

---

[1] In addition, there was a related third contract specifically concerning the
construction of a sewer line.

stipulated that the amount owing to Bushey for work performed under the Tanglewood Contract is $23,511.28. This sum is to be offset, in whole or in part, based on the determination of this Court concerning whether Birchwood is owed damages on its sand claim.

In addition, at trial, the Court entered judgment as a matter of law in Bushey's favor concerning Birchwood's claim regarding a sink hole at the site.

## III.  The History of Excess Sand

The trial in this matter focused on whether Bushey was required under the Contracts to keep excess sand generated by the projects at the site. While the Court will assess the contractual provisions later, it makes the following factual determinations with regard to the parties' understandings and actions concerning excess sand.

On June 15, 2006, the parties met with the Zoning Administrator for the Town of Essex. He reminded them that, unless they obtained a special permit, any excess materials, including sand, would need to remain on site. The Town was concerned about the generation of dirt and traffic from any removal operation. Ex. 74 (9/6/06).

Soon thereafter, on June 18, Jenkins walked the site with Chase. They discussed possible locations where excess sand could be deposited. They identified some locations where the fill might be used in the future to help create an access to adjacent property.

In September 2006, Scott Myrick took over as Bushey's superintendent for the project. Jenkins met with Myrick on September 6 and confirmed that excess

3

material was to be placed in designated fill sites. Ex. 74 (9/6/06). A second conversation with Myrick later that month reiterated that excess material was to be placed in the fill sites. Ex. 74 (9/28/06).

In October 2006, Jenkins received a call from a person who lived near the project inquiring whether she might purchase excess sand. Jenkins indicated to her that she could have some of the sand, but she need the approval of the Town and Bushey.

In or about the same period, the Town received a complaint that sand was being exported off site and that no silt fence had been erected. The Town investigated, spoke with Myrick and told him to cease taking sand off site.

As the Tanglewood Project was about to begin major activity, the parties held a pre-construction meeting with the Town. The Town had received a complaint from neighbors about truck traffic and dust generated in connection with moving sand. The Town, again, informed the parties that the subdivision regulations did not permit removal of sand from the site. Jenkins questioned whether it could be removed for his own personal use, and the Town agreed. The Town indicated that sand could be removed solely for non-commercial/personal uses. It also noted, however, that if the Town received complaints about that process, Jenkins would need to apply for a special permit. Ex. 74 (5/11/07); *see* Ex. 29 (noting Town's view that trucking sand off site is inconsistent with regulations).

In 2007, Randy Maxfield replaced Myrick as superintendent at the project. On or about May 14, 2007, he identified a pile of sand that was impeding some of the

4

construction efforts. He asked Jenkins what Jenkins wished him to do with the sand. Jenkins told Maxfield to either deposit it in the fill sites at the Tanglewood project or take it to his Route 2A property. Ex. 74 (5/14/07).

On May 14 or 15, 2007, Jenkins had similar telephone conversations with Henry. Jenkins told Henry to put sand in fill sites at the project. Jenkins said that any additional excess fill should be taken to Jenkins' Route 2A property, and he agreed to pay Bushey their normal rate -- $65.00 per hour -- to take the materials to that location. Henry confirms this direction, although he adds that, in a prior call Jenkins indicated he did not care what happened to the sand. Even accepting Henry's testimony, it is undisputed that Jenkins almost immediately called Henry back and said to take any excess fill to Route 2A. That conversation and direction is further confirmed by Jenkins' May 15, 2007 letter to Henry in which he states: "Lastly, this shall confirm that I have requested that you haul any and all excess sand fill and topsoil to my property at 106 Colchester Road (Route 2A) in Essex and that I have agreed to pay for such trucking at your normal hourly rate." Ex. 13. Indeed, Jenkins indicates that the May 15 letter shall be deemed a Change Order, and thus part of the Tanglewood Contract.

The last load of sand that Jenkins received from the project at either of his off-site locations was on June 15, 2007. He assumed there was no additional excess sand and heard nothing different from Bushey.

On July 13, 2007, Jenkins visited the project and saw a truck leaving with a load of sand. He followed the vehicle to the Albert D. Lawton School. Bushey was

5

working on another project at the school at the time. The truck deposited the load of sand from the Birchwood project at the Lawton project site.

Jenkins immediately contacted Henry to discuss why excess sand was being taken to another Bushey project. Henry indicated that the sand was inhibiting the construction of Tanglewood, he needed to move it, and there was no more room at the Route 2A site. Henry told Jenkins he was doing him a favor because he was not charging for removing the sand. Jenkins told Henry not to remove any more sand from the project. Ex. 13 (7/13/07). While Henry did not recall this conversation, the Court credits Jenkins version of the event.

Despite Jenkins' direction, the evidence shows that some sand continued to be removed from the Tanglewood project. Ex. 72 (pp. 83-84). Bushey stockpiled the remaining excess sand at the end of Tanglewood Drive.

At trial, the parties disputed whether there was sufficient room at the project site to store all of the excess sand. Jenkins indicated he believed there was sufficient area at the site for storage. Bushey contended that there was insufficient room in the designated areas at the project sites to store the excess sand without removing certain trees and that Jenkins had told Bushey not to remove the trees. Bushey further contended that storing the sand at some of the designated locations would have created some erosion problems and would not have been permitted under applicable permits. Birchwood's engineer supported that conclusion as well, although he indicated that it may have been possible to amend those permits. The Court visited the site along with the parties and their counsel.

6

Based on the view and the evidence at trial, the Court agrees that sand could not have been lawfully placed at some of the points Jenkins and Chase had originally designated for excess sand. It also concludes that there was still sufficient room at the site for the excess sand but that storing it there likely would have required a permit change and would have required removing certain trees and undertaking a significant spreading and grading operation. The Court does not credit Henry's testimony, however, that Jenkins told Bushey not to remove trees to allow storage of excess sand. The Court determines that Bushey never presented Jenkins with the choice of removing trees for on-site storage versus taking the sand to an off-site location. Nor did it present Jenkins with the decision of seeking a permit amendment or taking the sand off site. Bushey made those choices unilaterally.

## IV. <u>Determination of the Amount of Sand Removed from Rosewood and Tanglewood and Its Value</u>

After learning that sand had been removed from the site without his permission, Jenkins sought to determine the precise amount that had been taken. Despite repeated requests, Bushey was never forthcoming with a definitive figure as to the amount of sand it had removed. Henry gave him an initial indication during the July 13, 2007 discussion that 50-60 loads were removed from the Rosewood project. Jenkins asked for a full accounting in that discussion and in a follow-up letter. Ex. 14. He received no response from Henry. Jenkins spoke with Ms. Jill Morway, a Bushey employee, in October 2007 and, again, asked for an accounting

7

concerning the sand. She indicated that she would check on the matter and get back to Jenkins. Ex. 74.

The parties met to discuss the sand issue in January 2008. Henry said he had a right to remove the sand to complete construction and that keeping the sand on site would have required removal of a number of trees, which would have been very expensive. Since Bushey had not charged Jenkins for the removal of the sand, Henry indicated his belief that they had done Jenkins a favor. (Henry adhered to that same view at trial)

At the January 2008 meeting, Henry provided some details as to the amount of sand that had been removed from the projects. He said that 700 cubic yards had been taken from the Rosewood project; 1,458 cubic yards had been taken from the Tanglewood project to Bushey's property; 1,026 cubic yards had been sold to a company called Bartlett Weaver; and 14 cubic yards had been taken to the Lawton school.[2]

---

[2] The Court acknowledges that the determination of the amount of sand removed cannot be determined with exact specificity. The trial testimony, the daily reports, the trucking invoices, and the Bushey Answers to Interrogatories all give varied estimates of the amounts taken. Henry also admitted that Bushey may have additional trucking records that it failed to produce. Further, the Court finds that the efforts Bushey made to investigate and vet its Answers to Interrogatories and Requests to Admit in this regard were less than sufficient. Based on those considerations, and the fact that it was the most contemporaneous estimate, the Court determines that Henry's initial estimate is the most reliable.

At trial, Jenkins and Henry both provided information as to the commercial value of sand at issue in this case. They confirmed that sand of the type taken from the Birchwood projects could be replaced for $3.50 per cubic yard now, although it may have been cheaper a couple of years ago. Based on the amount charged to Jenkins by Bushey for trucking, the costs of trucking the sand would be approximately $65.00 per hour. The parties disputed the amount of time necessary to transport any replacement sand. Each suggested using a different sand pit and each had different takes on the quickest routes to the project site and the amount of time necessary to complete the task. Jenkins also estimated the costs of spreading the sand would be once it was brought to the site. He felt it would take a bulldozer 114 hours to complete the work. Based on the amounts charged Birchwood by Bushey for bulldozer work, Jenkins estimated the spreading cost would be $11,514.. Jenkins indicated that, if he were awarded monetary relief in this case he "probably" would use it to obtain sand fill and would store it at the site for possible use in developing a building lot. Jenkins offered no other evidence in support of the above estimates.

Henry further testified that Bushey did not remove the sand to profit from it, and that Bushey mostly lost money on the sand when shipping and labor costs are deducted from the sale/use value of the sand. The Court credits this testimony. The Court does not find that Bushey set out to take Birchwood's sand and benefit from it. It viewed the sand as excess materials that needed to be disposed of in order for construction to continue. As it did not charge Birchwood for removing it, Bushey

9

attempted to cover part of its losses by selling or using the sand. While all that may be true, it does not change the key question of this case: did Bushey have the right or license to remove or sell the sand in the first place?

## V.  **The Lien and Its Aftermath**

The parties continued discuss their disagreements regarding the removal of the sand and amounts owed on the contracts following the January 2008 meeting. They agreed to meet again in February 2008. The parties failed to come to an agreement at the February meeting. Three days later, Bushey placed a lien in the rough amount of $29,000 on Birchwood's property.

The lien attached to all 60 acres of Birchwood's property in the vicinity of the Tanglewood and Rosewood Projects. This despite that fact that the subdivision permit under which all work performed on both projects was performed only encompassed about five acres.

The lien had an impact on Birchwood. At this time, Birchwood was attempting to sell lots within the subdivision. The lien inconvenienced a couple of sales. Specifically, with regard to the sale of one lot, Jenkins was forced to enter into a "hold harmless" agreement with the buyer securing the buyer from any future loss if the lien was ultimately foreclosed. With regard to a second lot, the buyer's attorney required that the lien be released prior to closing.

Birchwood requested that Bushey release the lien as it applied to this second lot arguing that there was sufficient equity in the remaining parcels (over $300,000) to cover the value of the lien. Bushey refused to release the lien unless Birchwood

deposited $29,000 in an escrow account to secure payment of its contract claim. Birchwood agreed to escrow the money, and it was able to consummate the sale of the second lot. The attorney who represented the buyer in that transaction testified at trial. He indicated that the delay, if any, in closing on the second lot was three weeks, at most. Jenkins did not testify as to any financial impact on Birchwood from the delay. But, he does claim that being required to place $29,000 in an escrow account that bears only a .99% interest for a period of years has caused him financial damage in the form of lost interest.

The parties agreed at trial that, but for potential claims of offset for damages incurred by Birchwood for the lost sand, Bushey was owed a significant sum under the contracts. The Court finds that Bushey held an honest belief that it was owed those monies and that it subjectively believed it had potential defenses to Birchwood's sand claim.

## VI. **Paving at the Rosewood Project**

As of March 2008, the Rosewood contract required Bushey to complete a second coat of pavement on Rosewood Avenue. In light of the ongoing disputes over payment and amounts owing, Henry testified that he feared Birchwood would refuse to pay Bushey if it completed the job. So, Bushey did not do the work. Jenkins credibly testified that he asked for an accounting concerning the sand he believed Bushey had from the project. He wanted an accounting and to receive credit for sand taken before paying additional sums under the contract.

11

Birchwood then hired another contractor to complete the paving. The second paving contractor charged Birchwood $887.00 more than Bushey had agreed to in the Rosewood contract. Bushey attempted to pay this amount to Birchwood by check in satisfaction of all Rosewood claims. Jenkins testified that he rejected the check because he felt it might compromise Birchwood's ability to seek damages for its claims concerning the sand. *See* Exhs. 45 & 50.

## LEGAL ANALYSIS

### I. Contractual Provisions Relating To Sand

The parties dispute whether the contractual arrangement between them had any provisions concerning sand. Bushey contends that, absent a specific, written contract term expressly stating that sand was to remain on site, Bushey could sell or use the sand for its own purposes. The Court disagrees. A builder is not free to do as it wishes with an owner's property that is moved during construction. An implied term of a construction contract under such circumstances is that items of value that are required to be moved during construction are either to be returned to their location or addressed with the owner. To hold as Bushey suggests would permit a contractor free reign to sell topsoil, minerals, or lumber harvested from a building site with no remuneration to the owner of the property. That is not the law. *See Harsch Props., Inc. v. Nicholas*, 2007 VT 70, ¶ 14, 182 Vt. 196 (noting that the covenant of good faith and fair dealing is "implied in every contract" and that it "protects against conduct which violates community standards of 'decency, fairness or reasonableness'" (citation omitted)).

12

In any event, even without implying such a term, the Court concludes that the contract documents and the agreements of the parties contemplated that the sand at issue in this case would remain on site. First, the Court concludes that the parties' actions and oral agreements indicated a shared understanding that excess sand was intended to remain on site, except for taking it to Jenkins' off-site properties. Bushey's lead representative during the bidding and initial contracting phase of the project was James Chase. Jenkins testified that he and Chase specifically discussed the issue of excess sand and came to an agreement as to the on-site locations where it was to be deposited. The Court credits that testimony. Further, Henry agreed at trial that the original understanding of the parties was that this was not a project where sand would be trucked off site. Indeed, Henry indicated that he relied upon Jenkins assertion that excess sand could remain on the site.

Second, the contract documents required Bushey to "comply with … laws, ordinances, rules, regulations and lawful orders of public authorities bearing on performance of the work." Exs. 2 & 10 Articles 9.6. Here, the applicable Town of Essex regulations did not permit the removal of excess sand. The Erosion and Sediment Control Permit for the projects stated that: "There will be no excess soil removed from the site." Exs. 78 p.6 & 78 p.16. Bushey was aware of this condition as Chase was designated as the "on-site coordinator" for the project. Ex. 78 p.10.

Similarly, the Town of Essex subdivision regulations did not permit removal of the sand. They provided: "No topsoil, sand or gravel shall be removed from the

13

subdivision for any other purpose than to meet construction needs of that particular subdivision unless special approval is obtained from the Zoning Board of Approval." Ex. 75 p.10. The regulations further permitted "extraction of earth resources" only as a conditional use in certain zones. Ex. 76. The regulation defines "extraction of earth resources" to include the "removal of … sand … except when incidental to or in connection with the construction of a building on the same lot." *Id.* Neither of the projects involved the construction of a building. Henry acknowledged at trial that he was aware of these permit conditions and that no approvals from the ZBA were obtained.

Henry contends, however, that this regulation gave it the right to remove sand if it was necessary to "meet the construction needs" of the project. The Court disagrees. For one thing, that view ignores the portions of the regulations that further limit removal of earth resources. As described above, those provisions would not permit the removal of sand for these projects without ZBA approval. Further, it is undisputed that the Town of Essex believed its regulations precluded the removal of excess sand. The Court credits the testimony that, during at least one meeting in June 2006, the Town Zoning Administrator specifically told both Jenkins and Bushey that sand could not be removed from the site without a special permit. Ex. 74. He reiterated that point at a May 2007 meeting. *Id.*

Although he made an exception for some limited removal of sand for Jenkins' personal use, he told both parties that no commercial removal of sand would be permitted. *Id.*; *see* Ex. 29 (Town's view of sand removal). In the face of the

14

contractual provisions and the position of the Zoning Administrator, Bushey cannot persuasively contend that the contracts at issue permitted it to remove the multiple loads of sand that it admits were removed during this project.

Finally, the May 15, 2007 letter from Jenkins to Henry sets to rest any lingering doubt as to whether the contract at issue contained a term concerning excess sand. That letter required Bushey to "haul any and all excess sand fill and topsoil to [Jenkins' off-site] property" at Jenkins' expense. Ex. 13. The terms of the letter were identified as Change Order No. 1, which became a part of the parties' existing contract.

## II.   Birchwood's Breach of Contract Claim Regarding Lost Sand

The Court has determined that the contractual arrangement between the parties did not permit Bushey to remove sand from the projects and to appropriate Birchwood's sand for its own use. Accordingly, based on the evidence submitted at trial, there can be no question but that Bushey breached the contracts between it and Birchwood.

## III. Damages for the Sand Removed by Bushey

Having found a breach of contract, the Court now turns to the proper measure of damages. Birchwood gives the court two possible formulas for calculating its contract damages for sand: (1) the market value of a filled-in building

lot at Tanglewood site minus the current value of that property,[3] or (2) the reasonable value of replacement sand, plus the cost of transporting the sand from the nearest open pit, plus the cost of spreading the sand.

Expectation damages are ordinarily awarded in breach-of-contract cases. 24 *Williston on Contracts* § 64:2 (4th ed., updated May 2011). "The purpose of expectation damages is to put the non-breaching party in the same position it would have been in had the contract been fully performed." *Tour Costa Rica v. Country Walkers, Inc.,* 171 Vt. 116, 124 (2000) (internal quotation marks and brackets omitted).

A.    **Market-Value Calculation**

Birchwood has not shown that it is entitled to the market value of an additional building lot at the Tanglewood site minus the current value of the land. Birchwood devoted hardly any evidence to this theory at trial. The Court has little evidence from which to determine, among other things: what efforts would be necessary to create a buildable site, whether additional work – other than providing sand for fill – would be necessary to improve the lot; what the market value of the lot is now; or what it would be if improved. In the absence of such evidence any attempt to calculate damages under such a theory would amount to speculation. The Court refuses to engage in such an exercise. *See Berlin Dev. Corp. v. Vt.*

---

[3] In its post-trial memorandum, Birchwood argues that its damages could be measured simply by the market value of the lot. Utilizing this formula would be flawed because it does not take into account that the property currently has value.

16

*Structural Steel Corp.*, 127 Vt. 367, 372 (1968) (rejecting damages that did not meet the "standard of reasonable certainty").

### B.   Replacement-Sand Calculation

Birchwood's principal assertion is that it is entitled to damages equal to the cost of replacing the sand taken, specifically the cost of replacement sand plus the value of transporting it to the project site and spreading it.

There is no question that Birchwood lost the value of the sand:  Bushey removed the sand, and Birchwood no longer has it.[4]  Jenkins and Henry testified that the cost of replacement sand, *i.e.*, the approximate market value of the sand removed, is roughly $3.50 per cubic yard.  As noted in the findings, the Court has concluded that Bushey removed 3,184 cubic yards of sand from the two projects. The total number of cubic yards multiplied by $3.50 equals $11,144.

Birchwood also seeks the cost of transporting the sand from the nearest open sand pit and the cost of spreading the sand at the project site.  Birchwood presents formulas for calculating these values.  The formulas only work with the insertion of

---

[4] Bushey argues that "the removal of the sand was neither foreseeable nor contemplated by the parties at the time they entered the contract."  Def.'s Proposed Findings of Fact & Conclusions of Law at 26.  It cannot be said, however, that the loss of the value of sand is a consequential damage of the breach of contract subject to the limitations of foreseeability.  It is inescapable that when Bushey breached the contract by removing Birchwood's sand, the loss of the value of the sand naturally flowed from the breach.  *EBWS, LLC v. Britly Corp.*, 2007 VT 37, ¶ 8, 181 Vt. 513. As such, foreseeability is not a prerequisite to recovery.  *See* 24 *Williston on Contracts* § 64:12 (4th ed., updated May 2011).  Even if it were, where property is taken from the owner without permission, the owner's loss of the value of that property is a foreseeable consequence of that act.

numbers that are fraught with layers of speculation.  As detailed below, such speculative evidence cannot be the basis for a damage award.

"The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained." *Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952).  A fact-finder can award an estimation of prospective damages only if there is evidence from which the estimate may be made with reasonable certainty. *Ferrisburgh Realty Investors v. Schumacher*, 2010 VT 6, ¶¶22–23, 187 Vt. 309; *see also* 22 Am. Jur. 2d Damages § 482 (WL, updated May 2011) (prospective damages are properly awarded only if the plaintiff proves them with reasonable certainty).  Failure to prove the existence of future damages with reasonable certainty precludes recovery. *Berlin Dev. Corp.*, 127 Vt. at 372; 24 *Williston on Contracts* § 64:9 (4th ed., updated May 2011); *see also Johnson v. Rule,* 105 Vt. 249, 253 (1933) (in a tort action, "future damages may be supported by evidence showing that there is a reasonable certainty or a reasonable probability that apprehended future consequences will ensue").

Here, damages beyond Birchwood's actual loss of the value of the sand have not been proven with reasonable certainty on a number of bases.  First, Birchwood has not spent any money on transporting or spreading replacement sand.  Although Jenkins testified that he "probably" would order replacement sand if Birchwood prevailed in this case, the Court agrees with Bushey that Birchwood did not establish that it will ever actually replace the missing sand.  Under such facts, Birchwood is not entitled to the cost of transporting and spreading the replacement

18

sand because it has not shown with reasonable certainty (or even a reasonable probability) that these damages will ever be incurred.

Such a result is consistent with the law of "cover" damages in the context of the Uniform Commercial Code. Under the Article 2 of the UCC, a buyer of goods has two primary choices should the seller fail to make delivery of goods: to either cover and recover damages therefor or to recover damages for nondelivery. 9A V.S.A. § 2-711(1). A buyer "may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." 9A V.S.A. § 2-712(1). If the buyer covers, it may recover the difference between the cost of cover and the contract price together with incidentals and consequential damages, minus the cost of not having to perform. 9A V.S.A. § 2-712(2). Subsection 3 notes that "[f]ailure of the buyer to effect cover within this section does not bar him from any other remedy." *Id.* § 2-712(3). It "expresses the policy that cover is not a mandatory remedy for the buyer. The buyer is always free to choose between cover and damages for non-delivery under [§ 2-713]." Official Comment—9A V.S.A. § 2-712. This means that Section 2-713 provides "a remedy which is completely alternative to cover." Official Comment—9A V.S.A. § 2-713. If the buyer does not choose to cover, it would not be entitled to "expenses or commissions in connection with effecting cover." 9A V.S.A. § 2-715(1).

The same is true here. Future damages are recoverable only if the plaintiff has proven that they will be incurred with substantial certainty. If the plaintiff

fails to cover, it is not entitled to expenses in connection with effecting cover. Birchwood has not shown that it will effect cover with substantial certainty. Therefore, it is not entitled to cover damages. Instead, it is limited to recovering that which it has actually lost—the value of the sand taken from it.

The Court concludes that Birchwood has failed to establish its damages with sufficient specificity on other grounds as well. In particular, Birchwood did not establish with reliability the attendant costs associated with bringing such a large amount of sand to the site. Specifically, it is likely that numerous trees would need to be cut and removed. Birchwood supplied no evidence of the costs of such an operation. In addition, Birchwood did not establish the costs of spreading the sand on the site. Jenkins provided an estimate of 114 hours of bulldozer time, but he also admitted that he is not a construction expert and has no experience in such work. His estimate of the time and machinery needed to spread 3,184 cubic yards of sand at the site amount to little more than a guess. Finally, the Court has visited the site and heard testimony regarding the legal requirements for depositing sand at the site. It has concluded that permit amendments likely would need to be obtained to retain the sand at the site. Birchwood has failed to establish that it could obtain such amendments or, if it could, what conditions or requirements those permits might set for the placement/spreading of the sand. Accordingly, the Court finds that it cannot award damages beyond the value of sand without engaging in improper speculation.

Bushey takes this conclusion beyond its breaking point by contending that Birchwood cannot prove that it is entitled to *any* damages because it would have had to make significant expenditures to remove trees to make room on site for the excess sand and to amend existing permits. It is true that, as a general principle of damages, any loss in value sustained as a result of the breach is offset by "any cost or other loss that [the injured party] has avoided by not having to perform." Restatement (Second) of Contracts § 347. Any attempt, however, to determine what Birchwood might have done or estimate what expenses it might have incurred would be an exercise in pure speculation because Bushey took the decision out of Birchwood's hands when it unilaterally removed the sand from the worksite. Birchwood never had to make a decision concerning the sand because Bushey did not allow it to. Had Birchwood been afforded that opportunity, it may have taken various actions. For example, it may have argued that the cost of removing the trees and amending the permits should have been borne by Bushey because it fell within the reasonable scope of the work of the contract. In the end, Bushey is simply not entitled to benefit in full from the uncertainty caused by its own breach. *See Wakeman v. Wheeler & Wilson Mfg. Co.,* 4 N.E. 264, 266 (N.Y. 1886) ("A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain.").

It is certain that Birchwood lost the value of the sand that was taken from the site by Bushey. That is the measure of Birchwood's damages in this case. Based on that determination and the Stipulation of the parties, the amount owed to Bushey

on its counterclaim for damages under the Tanglewood Contract is to be offset by $11,144.

## IV. <u>Birchwood's Slander of Title Claim</u>

Birchwood next argues that, by statute, Bushey was entitled to a lien on Birchwood's land inside of the right-of-way of Tanglewood Drive and that by placing a lien on all of Birchwood's land, Bushey disparaged its title in lands located outside of the right-of-way. Birchwood also argues that Bushey was obligated to narrow the scope of its lien when Birchwood asked it to because Bushey would have remained fully secured. Finally, Birchwood claims that Bushey falsely asserted the lien "when it knew Plaintiff's set-offs exceeded the value of the unpaid contract balance." Pl.'s Post-Trial Brief at 18. Bushey argues that its lien properly extended to the entirety of Birchwood's property and that Birchwood has not shown malice.

"To prove slander of title, plaintiff must show that: (1) defendant published a false statement concerning plaintiff's title; (2) the statement caused special damages; and (3) defendants acted with malice." *Sullivan v. Stear*, 2011 VT 37, ¶8. "The essence of the tort is the publication of an assertion that is derogatory to the plaintiff's title to property in an effort to prevent others from dealing with the plaintiff." *Wharton v. Tri-State Drilling & Boring*, 2003 VT 19, ¶ 14, 175 Vt. 494 (mem.). As is relevant here, the assertion of a false mechanic's lien can form the basis of a slander-of-title claim. *See Id*. ¶¶15–16.

Under Vermont's mechanic's lien statute, a contractor who makes improvements on real property "shall have a lien upon such improvements and the

lot of land on which the same stand." 9 V.S.A. § 1921(a). The phrase "lot of land" "shall be deemed to be all of the land owned or held by the owner and used or designated for use in connection with such improvements, but such lien shall not extend to other adjacent lands used for purposes of profit." *Id.* § 1921(e).

Bushey contends that the scope of the lien was proper because Tanglewood Drive "benefitted all of the building lots in that those lots could not obtain building permits without the paving work that [Bushey] performed." Def.'s Proposed Findings of Fact at 30. Birchwood admits that and more, stating that "the adjacent lands were to be 'used . . . in connection with' the improvements constructed by Defendant." Pl.'s Post-Trial Brief at 18. But, Birchwood also relies on the language of the statute and points out that the lands outside of the right-of-way were to be "used for profit" and, therefore, were not part of the ""lot of land' subject to the lien." *Id.*

The meaning of Section 1921(e) in this regard is a matter of first impression in Vermont. The Court undertakes the task of discerning the meaning of this provision, keeping in mind that the purpose of statutory interpretation "is to effectuate the intent of the Legislature by first looking at the language of the statute." *Ketchum v. Town of Dorset*, 2011 VT 49, ¶10 (mem.) (internal quotation marks omitted).

The Court concludes that Birchwood has failed to show that Bushey published a false statement concerning plaintiff's title. The first clause of Section 1921(e) clearly states that the phrase "lot of land" includes "all of the land owned or held by

23

the owner and used . . . in connection with such improvements." The second statutory clause—"but such lien shall not extend to other adjacent lands used for purposes of profit"—does not modify the meaning of the first clause, but merely defines its limits. Specifically, the lien shall not extend to *other* adjacent lands, *i.e.*, those lands that are not used in connection with the improvements. Thus, because the entirety of the real property covered by the lien was used in connection with the improvements, as Birchwood clearly admits in its post-trial brief, the lien's scope was proper and not "overreaching." Pl.'s Post-Trial Brief at 18; *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) ("A court can appropriately treat statements in briefs as binding judicial admissions of fact.").

In a similar vein, Birchwood incorrectly argues that Bushey's refusal to reduce the scope of its lien when it had "more than adequate security" is a breach of the implied covenant of good faith and fair dealing.[5] This has nothing to do with Birchwood's slander-of-title claim. As noted above, the implied covenant of good faith and fair dealing is an implied-in-law promise between contract parties not to undermine or destroy the other party's rights to receive the benefit of the contract. *R&G Props., Inc. v. Column Fin., Inc.*, 2008 VT 113, ¶ 46, 184 Vt. 494. The covenant "does not obligate a [party] to take affirmative actions that the [party] is clearly not required to take under [the contract]." *E. Shore Mkts., Inc. v. J. D.*

---

[5] Birchwood did not plead a claim a for violation of the implied covenant. For these purposes, the Court assumes, *arguendo*, that such a claim was raised in this case.

24

*Assocs. Ltd. P'ship*, 213 F.3d 175, 182 (4th Cir. 2000); *see Downtown Barre Dev. v. C & S Wholesale Grocers, Inc.,* 2004 VT 47, ¶ 18, 177 Vt. 70) (noting same).

Here, the mechanic's lien has nothing to do with Birchwood's rights to the benefits flowing from the contract. The contract does not require Bushey to take any action with respect to mechanic's liens. Furthermore, the lien in this case properly extended to the entirety of Birchwood's property. Birchwood has not identified, nor is the court aware of, any legal or equitable obligation for a contractor to reduce the scope of a legally permissible mechanic's lien simply because the landowner contends that the contractor will remain fully secured. Such a duty would be contrary to the plain language of 9 V.S.A. § 1921(e), which defines the scope of the lien without reference to monetary values.

Finally, Birchwood argues that Bushey asserted its lien when it knew that Plaintiff was entitled to a set-off greater than the unpaid contract balance. The Court, however, concludes that Bushey did not believe that to be the case, and, indeed, the Court's ruling in this case supports that conclusion. At all events, even if Birchwood were correct, the slander-of-title claim would still fail based on its failure to establish malice.

Malice is "conduct manifesting personal ill will, evidencing insult or oppression, or showing a reckless or wanton disregard of plaintiff's rights." *Wharton*, 2003 VT 19, ¶16. In this case, the Court cannot conclude that the filing of the lien constituted malice. Both parties agree that Bushey was owed a significant sum in connection with the projects, although Birchwood contends that amount

25

must be offset by the damages owed to it for the lost sand. The Court has concluded that Bushey held an honest belief that it was owed significant sums and that it had a good faith defense to the sand claim. Under such facts, the Court cannot conclude that the filing of the lien constituted malicious conduct on the part of Bushey.[6] *See* Annotation, *Recording of Instrument Purporting to Affect Title as Slander of Title*, 39 A.L.R. 2d 840 § 4 (1955) (recordation "not actionable as slander of title if the defendant acted in the reasonable belief that he had in fact a valid claim against the property which he was entitled to record"). Birchwood's slander-of-title claim fails.

## V.   **Birchwood's Claim for Punitive Damages**

Birchwood also seeks punitive damages against Bushey. Exemplary damages are properly awarded when the plaintiff shows reprehensible conduct plus malice. *See Fly Fish Vt., Inc. v. Chapin Hill Estates, Inc.,* 2010 VT 33, ¶19 & n.2, 187 Vt. 541. They are available in contract actions "in certain extraordinary cases where the breach *has the character of* a willful and wanton or fraudulent tort," *Ainsworth v. Franklin Cnty. Cheese Corp.,* 156 Vt. 325, 331 (1991) (quoting *Glidden v. Skinner,* 42 Vt. 644, 647 (1983)) -- but only if the wanton breach includes or is also accompanied by malice, *Fly Fish Vt.,* 2010 VT 33, ¶19 n.2.[7]

---

[6] The Court holds that Birchwood has not shown the requisite malice with regard to its remaining slander-of-title arguments as well.

[7] While *Villeneuve v. Beane,* 2007 VT 75, ¶10, 182 Vt. 575 (mem.) separates the two elements of willful-tort-like breach and malice with the inclusive disjunction "or," *Fly Fish Vt.* clearly states that an award of punitive damages requires both.

As noted above malice is "conduct manifesting personal ill will, evidencing insult or oppression, or showing a reckless or wanton disregard of plaintiff's rights." *Wharton,* 2003 VT 19, ¶ 16. Recklessness can be the basis of malice if the evidence shows "that the defendant acted . . . in conscious and deliberate disregard of a known, substantial and intolerable risk of harm to the plaintiff, with the knowledge that the acts . . . were substantially certain to result in the threatened harm." *Fly Fish Vt.,* 2010 VT 33, ¶25.

Here, the actions of Bushey have the hallmarks of the tort of conversion.[8] Conversion "is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Restatement (Second) of Torts § 222A(1) (cited for the elements of conversion in *P.F. Jurgs & Co. v. O'Brien,* 160 Vt. 294, 300 (1993)). As colloquially stated by Professor Dobbs: "I take your watch and sell it. I have converted it and I am liable to you for conversion." D. Dobbs, The Law of Torts § 61, at 126 (2001). The same can be said of Bushey's actions with regard to Birchwood's sand.

Birchwood has failed, however, to establish that Bushey engaged sufficiently egregious conduct to warrant imposition of exemplary damages. On both prongs of

---

[8] Just prior to the start of trial, Birchwood sought to amend the Complaint to add a conversion count and leave of court to conduct additional discovery on that claim. Given the tardy nature of the request and the prejudice attendant upon Bushey in conducting additional discovery so close to trial, the Court denied the motion. Birchwood did not renew the motion to amend at trial.

the analysis, the Supreme Court has indicated that extreme, reprehensible and outrageous conduct is required in order to impose punitive damages. *Fly Fish Vt.,* 2010 VT 33, ¶¶18-19 (citing cases). Wrongdoing, even knowing and willful wrongdoing alone will not suffice. In this case, Bushey acted wrongfully in taking the sand without first obtaining permission from Birchwood. It also failed to act responsibly in providing a prompt accounting to Birchwood of the amount of sand taken after Birchwood repeatedly requested such information. The Court has found, though, that Bushey did not seek to obtain, nor did it profit from the sand (with the possible exception of the Lawton load), and did not undertake the conduct with any ill will toward Birchwood/Jenkins or for any malevolent purpose. The breach in this case was no, doubt, wrongful, but it does not rise to the level that would permit imposition of damages meant to punish Bushey.

## VI. <u>Birchwood's Breach of Contract Claim for the Rosewood Paving</u>

Under the terms of the Rosewood contract, Bushey was required to complete a topcoat of paving. It admits that it failed to complete the job and that Birchwood hired another contractor to complete it for $887.00 more than Bushey had agreed to in the Rosewood contract. Bushey makes no claim that the extra $887.00 was exorbitantly high or that the work was not required under the contract. Instead, it claims that it was not required to perform because Birchwood indicated that it would not pay for the work until a proper accounting could be completed concerning the sand that was removed from the project by Bushey. Bushey contends that

28

Birchwood's conduct constituted an anticipatory breach of the contract that precludes an award of damages. The Court disagrees.

The hallmark of an anticipatory breach – repudiation of the contract – is not reflected in Birchwood's actions. *See Downtown Barre Dev. v. GU Markets of Barre, LLC*, 2011 VT 45, ¶14 (mem.). Birchwood did indicate that it wanted to have an accounting and receive credit for sand removed from the project before paying Bushey additional amounts due under the contract. That position shows not a repudiation of the contract but an affirmance of it. As discussed below, the Prompt Pay Act permits an owner to withhold payments based on a good faith dispute as to the amounts owed. Birchwood did no more, and it is entitled to the difference between the amount it contracted to pay Bushey for the paving and the amount it ultimately paid another contractor to complete the job -- $887.00.[9] *See Van Velsor v. Dzewaltowski*, 136 Vt. 103, 105-06 (1978).

## VII. Claims for Attorneys' Fees and Penalties Under the Prompt Pay Act

Bushey seeks penalties and attorneys' fees under the Prompt Pay Act ("PPA"). Birchwood seeks its attorneys' fees under the PPA as well. For the following reasons, the Court denies both claims.

The PPA requires that statutory penalties be imposed to the extent an owner's failure to make prompt payment to a contractor was not based on a good faith

---

[9] Indeed, Bushey conceded that, prior to this litigation, it sent a check to Birchwood in the amount of $887.00 in an attempt to resolve this claim. Birchwood rejected it at that time because it was concerned that, by accepting it, Birchwood might be waiving its sand claims.

dispute concerning the amounts owed. 9 V.S.A. § 4007(a). Indeed, the PPA states that "[n]othing [in the PPA] shall prevent an owner, contractor or subcontractor from withholding payment in whole or in part under a construction contract in an amount equaling the value of any good faith claims against an invoicing contractor . . . ." 9 V.S.A. § 4007(a). To the extent an owner withholds payment based on a good faith dispute, the amount withheld must bear a "reasonable relation" to the sums that are in dispute. *Id.* § 4007(b).

In the instant case, the Court concludes that Birchwood withheld the amounts based on a good-faith dispute with Bushey and that the amount withheld bore a reasonable relation to the sums claimed by Birchwood. Birchwood has prevailed in its sand claim and had it established with specificity all of its damage claims, it would have approximated the amounts owed to Bushey. Had it prevailed in its claim for punitive damages, its recovery would have well exceeded the amounts owed to Bushey. While it did not prevail on those claims, the Court finds they were brought in good faith.

The PPA also provides that "the substantially prevailing party in any proceeding to recover any payment within the scope of this chapter shall be awarded reasonable attorneys' fees in an amount to be determined by the court . . . together with expenses." 9 V.S.A. § 4007(c). The issue of which party, if any, substantially prevailed is a matter that falls within the discretion of the Court. *Trombly Plumbing & Heating v. Quinn,* 2011 VT 70, ¶13 (mem.); *Fletcher Hill, Inc. v. Crosbie*, 2005 VT 1, ¶12, 178 Vt. 77.

30

Although Bushey might be viewed as the "net victor" in this action, that is not necessarily determinative of whether that party substantially prevailed. *See Burton v. Jeremiah Beach Parker Restoration & Constr. Mgmt. Corp.*, 2010 VT 55, ¶¶ 8–10 (affirming trial court's finding that the contractor substantially prevailed even though the property owner received a net judgment of $566*); Fletcher Hill, Inc.,* 2005 VT 1, ¶¶ 3, 17 (affirming trial court's finding that there was no substantially prevailing party, even though jury verdict was a net award of $11,067 in the contractor's favor); *see also Trombly Plumbing & Heating*, 2011 VT 70, ¶13. Instead of looking at the net victor, a court must focus on "which side achieved a 'comparative victory' on the issues actually litigated or the greater award 'proportionally' to what was 'actually sought.'" *Burton*, 2010 VT 55, ¶8. For instance, in *Burton*, the trial court ruled against Burton, even with his net victory, because he lost on a vast majority of his claims and did not receive even close to what he was seeking monetarily. *Id.* ¶¶9–10.

In this matter, the Court concludes that Bushey did not substantially prevail. Although it will receive more money than Birchwood in the Judgment, Bushey did not prevail on the merits of the sand issue. The Court is guided in this determination by the fact that nearly all of the evidence at trial concerned the sand issue, the legal memoranda focus on that issue, and there was no major dispute at

31

trial as to the amount Bushey was owed under the agreements.[10]  In other words,

Bushey lost the singular issue that was the focus of the trial of this action.

Moreover, Birchwood set out a good-faith defense to payment of the full amount

owed to Bushey based on the misappropriated sand.  *Trombly Plumbing & Heating*,

2011 VT 70, ¶ 9; *Maint  Mgmt. v. Pelino*, No. 1345-01 CnC (Vt. Super. Ct. Sept. 25,

2003) (Katz, J.), available at http://vermontjudiciary.org/TCDecisionCvl/2005-10-6-

4.pdf (both refusing to apply PPA penalties when homeowners withhold money for

good-faith claims).  Under such circumstances, the Court finds that Bushey did not

substantially prevail.

Although Birchwood prevailed on the principal issue that was litigated at trial,

the Court also concludes that it did not substantially prevail.  Birchwood sought

significant damages in this action, including punitive relief.  The Court's ruling

determined that it was entitled to far less than the damages it sought.  That,

coupled with Bushey's net victory, leads the Court to conclude that neither side

should be afforded substantially prevailing party status under the PPA.

---

[10] Indeed, the full amount of the sums allegedly owed to Bushey has remained in escrow pending a determination in this case, and Birchwood has never contended that Bushey should not receive credit for the work that is represented by those monies.

## CONCLUSION

Based on the foregoing, the Court finds that Birchwood is entitled to judgment in its favor on its claim concerning the Rosewood paving in the amount of $887.00 and on its claim concerning the lost sand in the amount of $11,144.00. Based on the Stipulation of the parties, Bushey is entitled to judgment on its claim for contract damages under the Tanglewood Contract in the amount of $23, 511.28.

As the parties have entered into a number of other stipulations concerning other amounts owed to them, the Court requests that counsel for Birchwood confer with counsel to Bushey to develop a comprehensive Judgment Order for the Court's review. The Judgment Order should take account of the parties' stipulations and otherwise be consistent with the findings and conclusions set out in this ruling.

Dated at Burlington, Vermont this __ day of October, 2011

_____
Timothy B. Tomasi
Superior Court Judge

_____
Charles Delaney
Assistant Judge

_____
Constance Ramsey
Assistant Judge