## STATE OF VERMONT

**SUPERIOR COURT**
**Lamoille Unit**

**CIVIL DIVISION**
**Docket No. 129-7-19 Lecv**

MCNALLY'S TRUCKING LLC
    **Plaintiff**

v.

RONALD J. WELLS d/b/a
RON WELLS TRUCKING
    **Defendant**

FILED

NOV 16 2020

VERMONT SUPERIOR COURT
LAMOILLE UNIT

## DECISION

This matter came before the undersigned judges for a final hearing on the merits on October 22, 2020. Both parties are in the trucking business and have asserted breach of contract and other claims against each other related to the failed purchase and sale of a trailer used to haul logs. Plaintiff is represented by Attorney Stephen L. Cusick. Defendant is represented by Attorney William W. Cobb.

Based on the evidence, the court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

Shannon McNally of Johnson, Vermont, is the sole member and manager of the Plaintiff, McNally's Trucking, LLC. Plaintiff has been in business for many years, primarily involved in dump trucks and not log trucks. Defendant Ron Wells of Peacham is a sole proprietor who spent 25 years logging, and then has hauled logs and pulp since 2005. The two had been friends for years, often sharing dinners together at Anthony's Diner in St. Johnsbury.

In December 2016, Wells was hauling loads from Robinson's yard in Passumpsic to locations in New Hampshire and Maine. He told McNally that there was work available at Robinson's yard and that he could get him "in" with work that would last the winter. Wells had a 2005 Fontane trailer that he had purchased new in 2005, and he offered him the use of this 2005 trailer for this work. The trailer was originally a flatbed trailer that had been converted to a logging trailer. McNally used this trailer for hauling loads out of Robinson's yard for 1-2 weeks, which was a new line of work for him, and then said he was interested in buying the trailer. They negotiated a price of $7,500. McNally claims that Wells said the trailer was roadworthy and that he (Wells) would get it "DOT'd."[1] Wells claims that he did not agree to "DOT" the trailer and

---

[1] This was never fully explained at the hearing. The trailer apparently had a valid inspection sticker. Possibly, being "DOT'd" involves a more thorough inspection such as occurred later, but this is not clear.

1

that while he expected the trailer to last for the winter, he intended to sell it in pieces for parts after the winter season. McNally says Wells did not tell him that he intended to sell it for parts, but rather represented that it was roadworthy. The court finds that Wells did say the trailer was roadworthy, but neither identified what was meant by that. McNally paid $3,750 on January 14, 2017, and was to pay the balance later at which time he would receive the title. McNally used the trailer successfully for hauling logs for approximately 7 weeks.

On March 6, 2017, McNally was pulling the trailer and was subject to a routine Department of Transportation (DOT) inspection of all trucking vehicles passing through Guildhall, Vermont, close to the New Hampshire border. The trailer was found to have cracks in the axles, which made it unsafe and it was put "out of service." The DOT inspector allowed McNally to pull it across the border to McDevitts trucking yard before "red-tagging" it, and it stayed there. Subsequently, Wells accompanied McNally up to McDevitts to look the trailer over. Wells concluded that it was not worth putting any more money into it and that he would take it back and junk it. The title had not yet been transferred to McNally because the balance of the purchase price had not been paid. McNally understood that he was not going to get his $3,750 back. He also had the choice of completing the purchase and putting significant money into repairs. The two were still friendly and went to dinner a couple of times over the next couple of weeks and discussed the issue.

Wells then offered to sell McNally a 2003 Fontane trailer he owned, and would give credit against the price for the $3,750 McNally had already paid for the 2005 trailer. The 2003 was also a flatbed trailer (multiuse) that had been converted to a logging trailer (single use). The 2003 trailer had brand new "super single" tires. McNally declined to buy the 2003 trailer at a price that included those expensive tires. However, he agreed to buy it without those tires.

Some facts about the transaction for the 2003 trailer are clear, and others are not. One clear fact is that McNally declined to pay a price that included the new expensive tires. They agreed these tires would not be part of the purchase. Another fact that is clear is that Wells would credit McNally, against the purchase price, with the $3,750 paid for the 2005 trailer, and also for $500 that McNally had spent on welding on the 2005 trailer. Another fact that is clear is that Wells would "DOT" the trailer, which he did. Another fact that is clear is that the title would not be transferred until the full purchase price was paid, but that in the meantime, McNally would be responsible for obtaining liability insurance, and would be using Wells's registration. This is what occurred. Another clear fact is that McNally and Wells worked together over a weekend to get the trailer ready for McNally, including taking the tires and rims off the 2005 trailer and putting them on the 2003 trailer, McNally took possession of the 2003 trailer on March 20, 2017 and began using it for hauling logs.

What is not clear is an agreement as to the purchase price. There was nothing in writing in any form. McNally testified that he declined to pay $20,000 for the trailer with the super single tires and rims, and that he agreed to pay $13,000 for the trailer with the tires and rims from the 2005 trailer. Wells says that the trailer with the super single tires and rims was worth $26,000 and $20,000-23,000 without them, and that he (Wells) agreed to sell the trailer for $20,000 with the tires and rims from the 2005 trailer. He testified that he would not have agreed

2

to sell for less than that because of the amount of money he had put into upgrading the trailer over the previous couple of years to get it in good shape. Each testified based on hindsight. The court cannot find either party credible about any conversation that took place in March 2017 in which an agreement on price was confirmed. The court finds that there is no credible evidence that the parties agreed upon a price in March of 2017.

From March 20, 2020 on, McNally used the 2003 trailer and hauled 9 loads a week with it for the next 4 ½ to 5 months for his sole source of income. He made various custom improvements to it. On April 6, 2017, he gave Wells a check for $5,000, which was accepted.

On May 15, 2017, either McNally or his wife gave Wells a second check for $5,000, which Wells accepted. The circumstances surrounding this payment and subsequent communications are highly disputed. McNally says that it took place at his property, that his wife handed Wells the check, that he asked for the title, and that Wells put him off with a statement that, "I'm not going anywhere." Wells says that McNally gave him the check while they were dining at Anthony's Diner and when McNally's wife went to the restroom, McNally asked for more time to pay the balance. If the price was $13,000, as McNally has subsequently claimed, with this check he had overpaid by $750. He says that was a mistake.

Around this time, the friendship appears to have been falling apart. McNally testified that he found out that Wells was hauling his loads. He also testified that "it all started when Wells lost his job at Passumpsic." The court has no information about whether there were reasons unrelated to the 2003 trailer that the friendship fell apart.

McNally says that he and his wife made numerous phone calls to Wells over the next several weeks asking for the title and sent a certified letter, and that Wells would not return his calls except for once when Wells talked with his wife. McNally claims that Wells never said that McNally owed more money for the trailer. In contrast, Wells says that he did not get a certified letter and that he made numerous phone calls to McNally over the next several weeks and McNally would not return his phone calls but answered once and when asked why he was not talking to Wells said something about pulp loads at Robinson's. The court need not make a credibility determination about who was not getting a response from the other. What is clear is that there was no meaningful communication from May to August.

In August, both McNally and Wells happened to be at the scalehouse in Shelburne, New Hampshire (a chip plant to which both hauled loads). Wells asked McNally when he would be paid. McNally says that Wells said the price was $20,000 not $13,000 and that this was the first time that Wells asked for more money for the trailer. There was a confrontation between them that caused a disturbance sufficient for McNally to be reprimanded at the scalehouse the next day. Each claims that the other was hollering and causing the scene. Wells told McNally that he (McNally) "was not going to pull that trailer until he [Wells] was paid." McNally left the scalehouse first.

Wells called the State's Attorney to report the trailer stolen, and was told to contact the Vermont State Police, which he did. A trooper called McNally about the report of a stolen trailer, and after hearing McNally's side of the story, said that it was a civil matter. McNally told the

trooper he would park it until the issue was resolved. Wells said the trooper never told him that it was a civil matter, but did say that he (the trooper) told McNally to park the trailer until the issue was resolved.

Wells called Robinson and told him not to load that trailer with logs anymore and to keep it parked at Robinson's lot. That never happened. McNally was fearful that if he used the trailer and got pulled over, he would be charged with theft. He did not have proof of ownership and it was registered in Wells's name and he knew from the trooper's call that Wells was claiming it was stolen. He did not use it. There is a dispute about where he initially parked the trailer. McNally says he had it in his yard for 4 months before moving it. Wells says it was not in McNally's yard but hidden elsewhere.

To continue hauling, McNally rented a trailer for $600 one month. He then purchased a 2004 trailer for $15,000. He paid $3,000 down and financed the balance of $12,000 through a commercial financing company. He made monthly payments of principal and interest over 2 years and has since paid it off. Payments included interest and late fees totaling $3,101.95, so his total expense was over $18,000.

In November of 2017, McNally moved the 2003 trailer to the property of Arthur St. Onge in Montgomery Center. Mr. St. Onge and his brother own a bridge construction business and a large property, including the former Montgomery town dump, where they keep numerous large pieces of equipment and vehicles, and he agreed to let McNally store the trailer there. The 2003 trailer was placed way in the back up a hill among other vehicles and items of equipment. It stayed there and nothing happened until May of 2019. Mr. St. Onge testified that he had placed several "No Trespassing" signs on the property as a result of having metal and other items scavenged from this lot, and that there is a gate but sometimes it is left open.

At some point, Wells consulted a lawyer and was told that since a plaintiff always has the burden of proof, he should not file suit but wait because if McNally filed suit first, McNally would then be the one with the burden of proof.

In May of 2019, Wells's long-time friend Mike heard McNally mention his friend Arty St. Onge. Mike checked the St. Onge property on Google Maps and saw where the trailer was parked. At 3:00 am on Memorial Day morning, Wells and Mike went to the St. Onge property. They both testified that although they saw a "No ATVs" sign, they did not see "No Trespassing" signs and there was no gate blocking the road up the hill to where the trailer was. They dragged the trailer away. Some of the brakes were locked, so it left black skid marks for 800 feet down the paved road on the St. Onge property and for 1 ½ miles on Route 118 until they stopped in a lighted place and freed the frozen brakes. Mr. St. Onge saw the marks in the morning and discovered that the trailer was gone and notified McNally.

McNally filed this suit in July 2019, and Wells counterclaimed.

Wells subsequently fixed up the 2003 trailer. He put new tires and wheels on it (a few were missing) and made other improvements at a total cost of $6,967.18. He intended to use it, but the wood business suffered as a result of the COVID pandemic. He sold it as part of a

4

package sale of two trailers for a total price of $25,000 of which $8,000 was for the 2003 trailer. Thus, he made $1,032.86 over his cost.

In October 2020, McNally saw the 2003 trailer advertised for sale on the internet for $15,000. He recognized it because there was a picture of it and he could see the details of the original conversion and the specific improvements that he had made, such as welded-on bracket straps and painted stakes.

McNally claims that he paid $13,750 for the 2003 trailer, that he has neither title nor possession, and that he had to replace it at a cost of $600 rental plus over $18,000 to purchase and finance the replacement.

Wells claims that McNally was supposed to pay $19,500 ($20,000 less $500 credit for the welding done on the 2005 trailer), and that he only paid $13,750, leaving a balance of $5,750 that he never paid. He claims that because he spent $6,967.18 fixing up the trailer for resale and sold it for $8,000, McNally is entitled to a credit of $1,032.80, leaving a balance of $4,717.80 in damages. He also claims loss of trailer rental value for 29 months (Jan 2017-May 2019) at $1,200 per month, which he claims is the reasonable rental value.

Both parties also claim additional damages, costs, and fees on grounds described below.

## Conclusions of Law

### Plaintiff's claims

*I. Breach of Contract*

A meeting of the minds on essential terms is necessary for contract formation. *Sweet v. St. Pierre*, 2018 VT 122, ¶ 12, citing *Starr Farm Beach Campowners Ass'n v. Boylan*, 174 Vt. 503, 505, 811 A.2d 155, 158 (2002) (mem.). As stated above, the undersigned factfinders find that at the time the arrangement for the sale of the 2003 trailer was discussed in March of 2017, there was no meeting of the minds on the essential term of price. See *id.* at ¶ 15 (holding that where the parties did not agree to an hourly wage or a share of the profits, compensation was a material term that without, the agreement was unenforceable). Therefore, Plaintiff has failed to meet the burden of proof to show an enforceable contract,

*II. Breach of Covenant of Good Faith and Fair Dealing*

Without an enforceable contract, there is no legal basis for a claim of breach of a covenant of good faith and fair dealing. *Carmichael v. Adirondack Bottled Gas Corp. of Vermont*, 161 Vt. 200, 208 (1993) ("The implied covenant of good faith and fair dealing exists to ensure that parties to a contract act with 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' Restatement (Second) of Contracts § 205 comment a (1981).").

*III. Conversion*

Plaintiff claims it paid the full contract price for the 2003 trailer and that Defendant refused to convey title and instead took possession of the trailer without permission and converted it to his own use. Conversion occurs when one person takes another's property for his own use by exercising dominion over it in exclusion of the other's rights. *Peck v. Patterson*, 119 Vt. 280, 282 (1956) (holding plaintiff failed to establish conversion of truck by failing to establish he ever had possession of the keys). Because of the lack of an enforceable contract and the ambiguity of the rights to the trailer during the period from May of 2017 on, Plaintiff has failed to show it legally possessed the trailer when Defendant took it. Thus, its claim for conversion of the trailer fails.

*IV. Common Law Fraud*

Common law fraud requires an intentional misrepresentation of an existing fact and must be proved by clear and convincing evidence. *Bennington Hous. Auth. v. Bush*, 2007 VT 60, ¶ 8, 182 Vt. 133, 933 A.2d 207; *Ianelli v. U.S. Bank*, 2010 VT 34, n*. Plaintiff claims that when Defendant represented that the 2005 trailer was "roadworthy," he intentionally misrepresented the condition of the trailer, that this statement affected the essence of the transaction, that it was false when made, that Defendant knew it was false or made it recklessly without knowing whether it was true or not.

Defendant disputes that he represented the 2005 trailer as "roadworthy." The court finds that he did represent the 2005 trailer as "roadworthy," but that the phrase does not represent a clearly defined standard about which there was an intentional representation. On January 14, 2017, when Plaintiff agreed to buy it, the trailer was 12 years old. It had a current valid inspection sticker and had been driven without incident by McNally for two weeks. There is no evidence that Defendant knew at the time of sale that there were cracks sufficient to put the trailer out of service. There was no expert testimony that the cracks existed at the time of sale. McNally had used the trailer for approximately 7 weeks by the time the cracks were discovered. The facts do not show that Plaintiff has met the necessary burden of proof to show an intentional misrepresentation on the part of Wells.

*V. Unjust Enrichment*

See discussion below for analysis of the unjust enrichment claims of both parties.

*VI. Punitive damages*

Punitive damages are available for tort claims when there exists wrongful conduct that is outrageously reprehensible, which was done with malice. *Fly Fish Vermont, Inc. v. Chapin Hill Estates, Inc.*, 2010 VT 33, ¶ 18. Because Plaintiff has failed to establish a tort— conversion and common law fraud— it cannot establish that an award of punitive damages would be appropriate.

Punitive damages are not generally available for breach of contract claims. *Glidden v. Skinner*, 142 Vt. 644, 647 (1983) (internal citation omitted). However, they are available in

6

certain extraordinary cases, specifically, where the breach has the character of a willful and wanton or fraudulent tort. *Id.* Even in a breach of contract case, a claim for punitive damages requires proof of malice and that the actor's actions were akin to a willful and wanton or fraudulent tort. *Murphy v. Stowe Club Highlands*, 171 Vt. 144, 155 (2000). Because Plaintiff has failed to meet the burden of proof to establish a breach of contract claim, there is no legal basis for punitive damages.

## Defendant's Counterclaims

### 1. Breach of Contract

As stated above, the court has found that there was no meeting of the minds on the essential element of price, and that Defendant, as well as Plaintiff, has failed to meet the burden of proof to show an enforceable contract.

### 2. Breach of Contract (Rental Agreement)

Defendant claims that Wells should have paid rent for the 2003 trailer from January 2017 to May 2019. At trial, the claim was made for 29 months at $1,200 ($34,800), less a credit for $13,000 paid. There is no evidence that there was ever any agreement for a rental of the trailer in any amount. Defendant has not proved a contract for trailer rental. The facts do not support a basis for implying any contract as a quasi-contract.

### 3. Conversion

As stated above in relation to Plaintiff's conversion claim, the circumstances as to the rights of the parties in the 2003 trailer were ambiguous from at least August of 2017 to the day of hearing, and Defendant took back possession in May of 2019. The evidence shows that from August 2017 until May 2019, McNally parked the trailer without using it at the trooper's direction because there was no resolution of the ambiguity. During that period, Plaintiff had paid the majority of any possible purchase price and Defendant himself did nothing to seek return of the trailer by legal means. Defendant has failed to prove that Plaintiff wrongfully converted the trailer to his own use.

### 4. Unjust Enrichment

See discussion below for analysis of the unjust enrichment claims of both parties.

### 5. Common Law Fraud

Defendant claims that Plaintiff committed common law fraud by promising to pay $19,500 for the trailer and taking possession of it and then willfully failing to pay the full price and hiding and attempting to steal it away from Defendant. Defendant has not proved the essential element of an intentional misrepresentation as to any of those acts. The burden of proof is not met as to this claim.

*6. Breach of Covenant of Good Faith and Fair Dealing*

Without an enforceable contract, there is no legal basis for a claim of breach of a covenant of good faith and fair dealing. *Carmichael v. Adirondack Bottled Gas Corp. of Vermont*, 161 Vt. 200, 208 (1993)

*7. Punitive damages*

Punitive damages are available for tort claims when there exists wrongful conduct that is outrageously reprehensible, which was done with malice. *Fly Fish Vermont, Inc. v. Chapin Hill Estates, Inc.*, 2010 VT 33, ¶ 18. Like Plaintiff, Defendant has failed to establish a tort—conversion and common law fraud— and therefore he cannot establish that an award of punitive damages would be appropriate.

As stated above, punitive damages are not generally available for breach of contract claims. *Glidden v. Skinner*, 142 Vt. 644, 647 (1983) (internal citation omitted). However, they are available in certain extraordinary cases, specifically, where the breach has the character of a willful and wanton or fraudulent tort. *Id.* Even in a breach of contract case, a claim for punitive damages in a breach of contract case requires proof of malice and that the actor's actions were akin to a willful and wanton or fraudulent tort. *Murphy v. Stowe Club Highlands*, 171 Vt. 144, 155 (2000). Because Defendant has failed to meet the burden of proof to establish a breach of contract, there is no legal basis for punitive damages.

*Unjust Enrichment Claims of Both Parties*

A claim for unjust enrichment must allege that a benefit was conferred on the other party, that the other party accepted the benefit, and that allowing the other party to retain the benefit would be inequitable. *Johnson v. Harwood*, 2008 VT 4, ¶ 15, citing *Center v. Mad River Corp.*, 151 Vt. 408, 412 (1989).

Both parties intended a contract but, for the reasons stated above, neither can prove an enforceable contract. The failure of an enforceable contract was based on lack of clarity and/or a misunderstanding between the parties while they were friends. Their subsequent falling out and how each responded to it resulted in consequences for each related to the trailer. The court looks to the overall circumstances to determine whether either became unjustly enriched as a result of the actions of the other as a consequence of the failed contract. *Kellogg v. Shushereba*, 2013 VT 76, ¶ 22 (internal citation omitted); *DJ Painting, Inc. v. Baraw Enterprises, Inc.*, 172 Vt. 239, 243 (2001).

McNally paid a total of $13,750. He had the use of trailers on an informal, "conditional ownership" basis created between friends from early January 2017 until August 2017. There is evidence that the rental value of a trailer of that kind would be $600-1,200 per month, meaning that he had value of $4,800-9,600. It enabled him to embark on a new means of earning income, which he continued thereafter, which was a benefit to him. Once it became clear to him, apparently in August of 2017, that Wells would not turn over the title until he paid more money and that he had no written contract on which to rely, he had choices. He could have paid the

8

additional money and demanded title; he could have filed suit seeking a declaration that he had paid in full and was entitled to title or, if not, alternatively to a refund of moneys paid; or he could have both paid the claimed balance and sought damages in addition to a declaration of the right to title. Instead, after getting no response from Wells, he parked and hid the trailer for a lengthy period, making it unusable to either party for a period that lasted 21 months and put it at risk for deterioration of its condition, which apparently occurred. Because of the choice he made, the loss of value he suffered over and above the benefits he received is attributable to his own choice of conduct following the discovery of the disagreement over price.

Wells made the poor choice of turning possession of the trailer over to McNally with no written or clear agreement as to the essential term of price. Once he realized that McNally's position was that no more money was owed, he also had choices. As of August of 2017, he knew from the trooper that it was likely the trailer was parked pending resolution of the impasse. He could have brought suit, seeking either replevin (return of possession) of the trailer or a declaration of rights with a claim for damages for the shortfall. Despite obtaining legal advice, he chose not to do so. Instead he waited 21 months until he located the trailer, and when he did, he engaged in self-help repossession. Overall, he had received $13,750 from McNally and in addition he received proceeds from the sale of parts of the 2005 trailer and although he spent money for improvements to restore the 2003 trailer to good condition, he still made a gain of a little over $1,000 on the resale of the 2003 trailer for total receipts of $14,750 for the 2003 trailer. Although he seeks rental value of the 2003 trailer for the period it was not available to him, there was no contract and the fact that this period lasted so long was due to his own inaction. To the extent he suffered any economic loss, any consequences are attributable to his own choice of conduct.

For these reasons, neither party is entitled to recovery on grounds of unjust enrichment.

### Summary

Based on the foregoing, judgment shall enter for Defendant on Plaintiff's claims, and judgment shall enter for Plaintiff on Defendant's counterclaims. Neither party shall be entitled to costs.

Dated this _11_ day of November 2020.

_Mary Miles Teachout_
Mary Miles Teachout
Superior Court Judge

_Joel Page_
Joel Page (as to facts)
Assistant Judge

9